Rebecca Ann SHAW, Appellant,

v.

The STATE of Texas.

No. PD–0211–06.

Court of Criminal Appeals of Texas.

Oct. 31, 2007.

Rehearing Denied Jan. 16, 2008.

L. Patrick Davis, Fort Worth, TX, for Appellant.

David W. Vernon, Assistant District Atty., Cleburne, Matthew Paul, State's Atty., Austin, for State.

## OPINION

PRICE, J., delivered the opinion of the Court in which KELLER, P.J., and MEYERS, KEASLER, HERVEY and COCHRAN, JJ., joined.

The appellant was charged with intentionally, knowingly, or recklessly causing injury to a child. The jury convicted her of causing the injury recklessly. On appeal she complained that the trial court erred in failing to instruct the jury on the so-called "Good Samaritan" defense. The court of appeals held that the trial court did not err in refusing to submit the instruction. We granted the appellant's petition for discretionary review to address the appellant's claim that in so holding the court of appeals applied an incorrect legal standard.

We hold that the court of appeals applied the correct legal standard in determining whether the evidence "raised" the "Good Samaritan" defense in this case. We also hold that, in order to obtain an instruction on the "Good Samaritan" defense embodied in Section 22.04(k) of the Penal Code,[1] the appellant must show that the record contains evidence sufficient to support a rational finding, not that she lacked the requisite mental state necessary to commit the offense, but that she in fact harbored the requisite mental state, but nevertheless engaged in the conduct under emergency circumstances, in good faith, and with reasonable care. Because the record contains insufficient evidence to establish the defense as so construed, we will affirm the judgment of the court of appeals.

## FACTS AND PROCEDURAL POSTURE

### At Trial

In February 2002, a Johnson County grand jury returned an indictment charging the appellant with one count of injury to a child and one count of manslaughter.[2] The indictment alleged, in relevant part, that the appellant, by "shaking [Schuyler Bryce Shaw, a child younger than fifteen years of age,] and causing his head to strike an unknown object," had intentionally or knowingly caused serious bodily injury to him (count one, paragraph one), had recklessly caused serious bodily injury to him (count one, paragraph two), and had recklessly caused his death (count two).[3]

In July 2003, the State brought the appellant to trial before a jury on her plea of not guilty. At the guilt stage of trial, the State presented ten witnesses and a few exhibits, and the appellant presented one witness (herself) and a few exhibits. The State's first witness, Miranda Shaw Key, testified that (1) she was the appellant's daughter; (2) she had a twin sister named Melissa Shaw, who had cerebral palsy, scoliosis, and "some mental incapacities"; (3) on August 30, 2001, while she and Melissa resided with the appellant in Johnson County, she (i.e., Miranda) gave birth to a boy, whom she named Schuyler Bryce Shaw; and (4) on October 15, 2001, she transferred her parental rights over Schuyler to the appellant and then moved out of the residence.

The State's second witness, Robert Johnson, testified that (1) he was a deputy sheriff of Johnson County; (2) on November 9, 2001, at around 2:00 p.m., he was dispatched to a residence "in reference to an infant that wasn't breathing"; (3) upon arrival at the residence, he found the appellant "doing CPR [cardiopulmonary resuscitation] on an infant"; and (4) shortly thereafter, emergency medical personnel arrived and transported the infant to Cook Children's Hospital in Fort Worth.

The State's third witness, Michael Gaudet, testified that (1) he was a detective with the Johnson County Sheriff's Office; (2) on the evening of November 9, 2001, he was dispatched to Cook Children's Hospital in connection with this case; (3) upon

---

1. *See* former TEX. PENAL CODE § 22.04(k)(1)(B), since recodified without substantive change as § 22.04(k)(2). This provision reads: "It is a defense to prosecution under this section that the act or omission [causing injury or serious bodily injury to a child] consisted of ... emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts."

2. *See* TEX. PENAL CODE §§ 19.04(a) & 22.04(a)(1).

3. The State abandoned the manslaughter count at some point in the trial before the case was submitted to the jury.

arrival at the hospital, he learned from a doctor that Schuyler Shaw had sustained brain injuries; and (4) while at the hospital, he also spoke with the appellant. Gaudet's testimony continued:

Q: What did she tell you about Schuyler's medical history?

A: That Schuyler had "SVT" ... which is supraventricular tachycardia, which is basically a heart problem with rhythm, and that the child was taking Digoxin twice a day for that; also that he had a small heart murmur.

* * *

Q: And what did Rebecca Shaw tell you about what had happened that date, November 9th, 2001?

A: She told me that approximately 8:30 that morning, that Schuyler Shaw had woken up, that he had a dirty diaper, loose stool, that [on the] prior day that he had loose stool all day long, diarrhea; that she then gave him his medicine and then fed him and he only drank two ounces, that he spit up a little bit. And when he spit up, it was a little phlegmy. That she then was talking with her mother on the phone and walked around the house with Schuyler, set down in front of the computer, because he liked to look at the colors on the computer monitor, and talked to her mother for a while, and then went and laid him down for a nap about 9:30.

Q: 9:30?

A: A.M.

Q: Okay. Let me ask you this. Did she tell you who all was home during that time?

A: Just her and Schuyler.

Q: Did she tell you where Melissa was?

A: Melissa was at school.

* * *

Q: What, if anything, else did she tell about what happened that day?

A: That when she laid Schuyler down for a nap, that she laid him down on his back to start with. She waited until he had gone to sleep, went back into the room, rolled him over onto his stomach, and then went about completing her laundry, and that she came back to wake him back up about 2:30.

Q: So from 9:30 a.m. to 2:30 p.m., she told you, Schuyler was taking a nap?

A: Yes, ma'am.

Q: Okay. And at 2:30 p.m., what did she tell you about what happened?

A: That she had gone in to wake Schuyler up. She checked his diaper, that he peed in it. He wasn't awake at that point. She called to him. He didn't respond. She took his arm. He didn't respond. When she picked him up, that his head fell fully back and she noted that his breathing was labored. At that point, she became panicked, ran to the diaper bag, obtained a heart monitor, a contact-type style, ran to the kitchen, attempted to wet the leads, had to move Schuyler from one arm into the other arm to operate the faucets. She then checked his heart beat with the heart monitor and obtained a heart beat of approximately 53 beats per minute, and he still had labored breathing.

Q: 53 beats per minute?

A: Or 53 beats for a 30–second count.

Q: Okay. At that time, she said, he was still breathing?

A: Yes, ma'am.

Q: And then what did she tell you happened?

A: She thought about calling 911 at that point and then figured that 911 emergency services, the ambulance, the volunteer fire department would not be

able to find her. She then called her landlord, talked to the answering machine, hung up and then called 911. And at that point the dispatcher found out the situation, transferred her to ... American Medical Response, and the volunteer fire department and the sheriff's officers were in route.

Q: So what, if anything, else did she tell you that she—

A: That she had performed CPR at one point. She remembers that the front door's locked. She goes to the front door, unlocks the front door. That when they get there, she's doing CPR. They check Schuyler, and they transport him.

Q: Did you have any conversation with Rebecca Shaw that night about how Schuyler may have gotten these brain injuries that the doctor told you about?

A: Yes, I did.

Q: And what, if anything, did she tell you about that?

A: I asked her if she accidentally dropped Schuyler, put him down too hard, and she denied it, at which point I asked her, if you didn't cause these injuries, who might have, at which point she tells me that Melissa Shaw had dropped Schuyler on his head the day prior about 8:00, 8:30 in the evening, and that Melissa was in a seated position in the living room while she was in the kitchen baking cookies, and she heard a thump that sounded like a hollow melon. She then came in the living room and found Melissa still seated in the floor, with Schuyler laying next to her, with Melissa going, "I'm sorry, I'm sorry, I'm sorry."

Q: And what, if anything, did Rebecca tell you what she did then?

A: Rebecca said that she picked up Schuyler and checked him for injuries. He didn't have any bruising to the skull or to the skin. He didn't have any cuts. He didn't have any marks that she could observe, that his eyes looked okay, that he was still fussy at that point, but everything appeared to be okay with him at that point.

The State's fourth witness, Juan Alaniz, testified that (1) he was a social worker at Cook Children's Hospital; (2) on the evening of November 9, 2001, while he was on duty at the hospital, he spoke with the appellant about Schuyler Shaw's injuries; and (3) the appellant told him that two days earlier, Schuyler had fallen out of his aunt's arms onto the floor.

The State's fifth witness, Donna Dyar, testified that (1) for three days in mid-November 2001, she and the appellant shared a cell in the Johnson County Jail; (2) during that time, she and the appellant discussed what had happened to Schuyler Shaw; (3) the appellant told her that "she was going to blame [what had happened to Schuyler] on her daughter, because [her daughter] was in a wheelchair, and that if she blamed what happened to the baby on her, [her daughter] wouldn't get in trouble"; (4) the appellant said that her explanation for Schuyler's injuries would be that "she was in the kitchen baking cookies and she heard a loud noise, sounded like an egg cracking"; (5) the appellant complained to her that Schuyler's crying "made her lose her job" because "she couldn't sleep"; (6) the appellant confessed that she shook Schuyler "because [he] kept crying and wouldn't go to sleep"; and (7) the appellant said that when she shook Schuyler, he stopped breathing.

The State's sixth witness, Burton Putegnat, testified that (1) he was a pediatric radiologist at Cook Children's Hospital; (2) on November 9, 2001, he x-rayed Schuyler Shaw's brain; (3) the resulting radiographs revealed "diffuse swelling" of Schuyler's brain, with both "subarachnoid

and subdural" hemorrhages; (4) such injuries were "typical ... after a severe shaking"; and (5) "when children are shaken severely, they can stop breathing."

The State's seventh witness, Angel Hernandez, testified that (1) he was a pediatric neurologist at Cook Children's Hospital; (2) on November 9, 2001, he examined Schuyler Shaw and reviewed the radiographs of his brain; (3) Schuyler was comatose at that time and unable to breathe on his own; (4) Hernandez's physical examination of Schuyler revealed that the boy had no visible external injuries; (5) the radiographs of Schuyler's brain revealed no skull fracture, but they did reveal both subarachnoid and subdural hemorrhages, with the subarachnoid hemorrhage being the more serious; (6) Schuyler's injuries were consistent with a severe shaking or a blunt-force trauma but were not consistent with a fall from a height less than four feet; and (7) symptoms of the subarachnoid hemorrhage must have occurred within six hours of a severe shaking or blunt-force trauma.

The State's eighth witness, Susan Davis, testified that (1) she was a physician, board-certified in pediatric critical care; (2) in November 2001, she was involved with the care and evaluation of Schuyler Shaw at Cook Children's Hospital; (3) her examination of Schuyler revealed "massive brain injury"; (4) such an injury was not consistent with a fall from a low height; and (5) on November 11, 2001, at 7:30 a.m., she and other doctors at the hospital declared Schuyler to be brain-dead.

The State's ninth witness, Marc Krouse, testified that (1) he was a pathologist and medical examiner for Tarrant County; (2) on November 13, 2001, he performed an autopsy on Schuyler Shaw's body; (3) the autopsy revealed that Schuyler's death was caused by "something impacting his head or his head forcibly impacting some surface or object," possibly even bed padding; (4) "shaking might be how [Schuyler] was coming into impact"; and (5) Schuyler's injuries were probably not caused by a fall from a low height.

The State's tenth and final witness, Gail Ledbetter, testified that (1) she was a case worker in the Texas Department of Human Services (TDHS); (2) on November 6, 2001, at the TDHS office in Cleburne, she interviewed the appellant in connection with the appellant's application for public assistance; (3) the appellant was accompanied by "her grandson," who was in a stroller; (4) the appellant was upset because she had had to quit her job in order to care for her grandson; and (5) the appellant was also upset because "her fiance had left her ... because of the child."

In addition to witnesses, the State's evidence included four exhibits, the most notable of which was State Exhibit Number Two, which consisted of Schuyler Shaw's medical records from Cook Children's Hospital. Those records totaled approximately 200 pages. Included in the records was a two-page "Pediatric Neurology Consultation" report by Dr. Angel Hernandez, dated November 9, 2001. In that report, Hernandez expressed the view that Schuyler's "subarachnoid hemorrhagic is probably the result of aggressive, cardiopulmonary resuscitation, although [he could] not rule out the possibility of a nonaccidental trauma." [4]

The appellant took the stand in her defense and testified that (1) in the fall of 2001, she lived with her two daughters, Miranda and Melissa, and Miranda's baby

---

4. No one at trial discussed, or even mentioned, this report until defense counsel did so during his closing argument at the guilt stage.

boy, Schuyler; (2) at that time, she worked as a "medical assistant" in a pediatrician's office;[5] (3) her duties as a medical assistant included "everything that was required to take care of all the children in [the pediatrician's] office: immunizations, checking them in, weighing them"; (4) she had had training in the proper care of children and understood how to handle a child properly; (5) on October 15, 2001, Miranda moved out of their residence, leaving Schuyler in the appellant's care; (6) the appellant took a voluntary leave of absence from her job as a medical assistant in order to care for Schuyler; (7) caring for Schuyler properly (i.e., feeding him, bathing him, playing with him, changing his diaper, providing appropriate medical care, etc.) was not a burden, and she did so happily; and (8) Schuyler had a "heart condition," for which he was given daily medication. The appellant's testimony continued:

> Q: And [on November 9, 2001,] you woke up, you saw Melissa take the bus to school. And at what point did you wake up Schuyler [that] morning?
>
> A: Approximately 8:30.
>
> Q: When you woke Schuyler up, Schuyler woke up, did you notice anything that would cause you concern about Schuyler?
>
> A: No, sir.
>
> Q: I'm asking you again. Did you notice any visible injury to Schuyler?
>
> A: No, sir.
>
> Q: How was Schuyler's breathing?
>
> A: It appeared to be normal.

* * *

> Q: Tell me, on November 9th, 2001, what prompted you to place a phone call to 911?
>
> A: I had found Schuyler in his crib, and he was having labored breathing. And I felt I needed medical attention, and I couldn't get him to a hospital and watch him at the same time and drive myself.
>
> Q: Okay. What did you do physically when you saw Schuyler in his crib having breathing problems?
>
> A: I dropped the clothing that I had in my hand, and I ran to his crib, and I picked him up, and I called to him. He did not respond.

* * *

> Q: Ma'am, I want you to show the jury, when you came in and saw Schuyler in his crib not responding, show the jury how you picked him up, and what did you do next?
>
> A: (demonstrating)[6] He was laying like that when I found him.
>
> Q: Okay. That's where he's there. Show me how he was laying.
>
> A: (demonstrating) He was on his stomach, and his head was in this position in the bed.
>
> Q: This is about 2:15 p.m. in the afternoon; is that correct?
>
> A: Approximately.
>
> Q: And what did you do next?
>
> A: (demonstrating and crying) I went over, and I went like this, and then I picked him up like this, and I called his

5. On direct examination, defense counsel asked the appellant, "What's the licensing for becoming a medical assistant to a pediatrician?" The appellant responded, somewhat ambiguously, "You have to go through school and become licensed. I went through school and graduated."

6. Although it is not entirely clear, the appellant was apparently demonstrating with a doll.

name, and his little head went over. And I pulled him to me, and I ran through the house to get his heart monitor out of the diaper bag, which was in the living room....

Q: At this point, Ms. Shaw, how are you holding the baby as you go to the monitor? Show the jury—

A: (demonstrating and crying) Like this.

Q:—how you're holding the baby.

A: (demonstrating and crying) I'm holding him like this, and I'm crying, and I'm telling him to stay with me, hang on.

Q: You then hooked him up to the heart monitor?

A: (demonstrating and crying) No. I went into the kitchen and got a wet rag out of the drawer. I pulled a rag, and I wet it, and I patted him like this. And I couldn't get the faucet to turn on, so I switched arms like this. And I got the faucet on, and I got the rag wet and turned the faucet off and then grabbed the monitor. I went into the room, the bedroom, because there is no—phone in the bedroom has a speaker phone, and it's got the attachment for the heart monitor, because the phone in the living room didn't have that attachment.

Q: Okay. What happened next?

A: (demonstrating and crying) I placed him on the bed with the heart monitor, and I grabbed the phone, and I placed the receiver button.

Q: Okay. Rebecca, stop now. Show the jury how you placed him on the bed at this point.

A: (demonstrating and crying) I placed him on the bed like this, and I put the heart monitor here, and I grabbed the phone and sat it here, and I hit the speaker button. And the rag was here. It was in my hand, and I threw it there.

Q: Okay. What happened next?

A: (demonstrating and crying) I had dialed my landlord's number, and I got the recording, and so I hung up the speaker phone, and I hit it again and called 911. And the only reason why I called them first was because they were closer, and I was concerned that 911 wouldn't get to me because I was in the country.

\* \* \*

Q: Okay. You were instructed to perform CPR by the dispatcher, is that correct?

\* \* \*

A: (demonstrating and crying) I was talking to [the dispatcher], and then he told me what to do. And he told me to do the rescue breathing and to tip his head back. So I tipped his head back, and I was blowing in his mouth. And I could feel I wasn't getting a seal on his nose with my cheek, and I couldn't open my mouth big enough to get around his mouth and nose.

Q: Are you holding him or is he laying down in a stationary position?

A: (crying) He's on the bed at this time.

Q: Okay. You started performing CPR at this time?

A: Just rescue breathing at first.

Q: Okay. What happened next?

A: (demonstrating and crying) I remember the door was locked, because he said the paramedics were on their way. And I remembered the door was locked. And I told him I needed to unlock the door, and so I grabbed Schuyler underneath like this, because that's how they taught us in ER [Emergency Room?] class to carry like this. And I went through the house, and I unlocked the

door. I was running through the house, and I unlocked the door.

Q: You unlocked the door, and what happened next?

A: (demonstrating and crying) I ran back to the phone in the bedroom.

Q: And what happened next?

A: (demonstrating and crying) And started doing CPR when the paramedics told me to do CPR. [Schuyler] was back on the bed, and I was screaming for the paramedics to hurry.

\* \* \*

Q: Okay. And then at some point did 911—did somebody from the sheriff's department arrive, or have we left anything out?

A: The police officer got there first, and he took me by my arm and [said], "Ma'am, come in here, come in here with me."

Q: Stop there. Where is Schuyler when this happens? Is he in your arms?

\* \* \*

A: I'm on my knees on the floor, and [Schuyler is] on the bed in front of me.

\* \* \*

Q: What's going on?

A: I don't know what's going on, except the paramedics did come in right after that, and they started working on [Schuyler].

\* \* \*

Q: [On] November 9th, when the 911 call came down . . ., where was Melissa?

A: She was at school.

Q: Okay. And when did she leave for school that morning?

A: About 7:15 or 7:30 [a.m.], the bus picked her up.

In summary, the thrust of the State's evidence was that: (1) on November 9, 2001, ten-week-old Schuyler Shaw sustained massive brain injuries, which ultimately caused his death; (2) those brain injuries were the result of deliberate, severe shaking and/or blunt-force trauma; (3) the most serious brain injury, the subarachnoid hemorrhage, occurred within six hours of the severe shaking and/or blunt-force trauma; (4) given the circumstances, only the appellant was in a position to have caused the injuries; (5) the appellant shook and/or struck Schuyler out of anger or frustration, because he kept crying and would not go to sleep; and (6) the appellant concocted a story, involving her daughter Melissa, with which to explain the baby's injuries. In contrast, the thrust of the appellant's evidence was simply that: (1) on November 9, 2001, at around 2:15 p.m., she found Schuyler, who had an abnormal heart, in a non-responsive state; and (2) she immediately telephoned 911 and, shortly thereafter, began cardiopulmonary resuscitation.

At the charge conference, the appellant asked the trial court to instruct the jury on the Good Samaritan defense provided by Texas Penal Code § 22.04(k)(1)(B) (later recodified, with its text unchanged, as Texas Penal Code § 22.04(k)(2)). The appellant did not explain to the trial court how the evidence at trial supported the requested special charge; she simply urged the trial court to "recall the testimony." The State argued in response that there was no evidence to support the requested special charge. The trial court denied the appellant's request.[7]

---

**7.** At the close of final argument, the appellant again requested a special charge on the Good

Samaritan defense, but that second request was untimely and preserved nothing for ap-

The jury subsequently found the appellant not guilty of intentionally or knowingly causing serious bodily injury to Schuyler Shaw but found her guilty of recklessly causing serious bodily injury to him.[8] The jury assessed the appellant's punishment at imprisonment for twenty years and a fine of $10,000.

## On Appeal

On direct appeal, the appellant brought a single point of error, arguing that the trial court erred in denying her requested special charge on the Good Samaritan defense. In particular, the appellant argued that the "Pediatric Neurology Consultation" report by Dr. Angel Hernandez, introduced into evidence by the State, "raised the defensive issue that the appellant's attempt to save her grandson's life may have, in fact, tragically [ended] it."

The State's response to the appellant's argument was threefold. The State argued first that "the trial court did not err in denying [the requested] jury instruction because there was no evidence in the record to raise same." The State argued second that, in any event, the trial court could not be faulted for denying the requested instruction because "defense counsel failed his duty of informing the trial court where [in the record] the evidence was that supported [the] requested jury instruction." [9] The State argued third that, "given the overwhelming evidence that Schuyler Shaw's injuries were not the result of aggressive CPR, it is inconceivable that the appellant suffered any harm from the trial court's denial of the requested jury instruction."

The court of appeals, by a vote of two to one, overruled the appellant's point of error and affirmed the judgment of the trial court.[10] The court of appeals explained that, "[b]ecause a rational juror could not have found that Shaw's conduct in shaking the baby and hitting its head against an object was reasonable emergency medical care or that Shaw was not licensed in the healing arts, the defense in question was not raised." [11] The court of appeals did not reach the State's other two arguments.

The appellant later filed a petition for discretionary review, which we granted. In her petition and accompanying brief, the appellant argues: (1) the court of appeals, in determining whether the trial court erred in denying her requested special charge on the Good Samaritan defense, "erroneously applied a 'rational-juror test' ... instead of the well-established 'raised-by-the-evidence test'" (ground for review number one); (2) the court of appeals erred in holding that the evidence adduced at trial did not raise the Good Samaritan defense (ground for review

---

pellate review. *Seefurth v. State*, 422 S.W.2d 931, 935 (Tex.Crim.App.1967); TEX.CODE CRIM. PROC. art. 36.15; George E. Dix & Robert O. Dawson, 43A TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 42.217 (2nd ed.2001).

**8.** The trial court properly instructed the jury, in accordance with Texas Penal Code § 6.03(c), that:

"A person acts recklessly, or is reckless, with respect to the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that the result will occur. The risk must be of such a nature and degree that its disre-

gard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the actor's standpoint."

**9.** "A trial judge," the State argued, "cannot be expected to remember every bit of testimony adduced at trial or know the contents of every page of every exhibit offered and admitted."

**10.** *Shaw v. State*, 181 S.W.3d 450 (Tex.App.-Waco 2005).

**11.** *Id.* at 457.

number two); and (3) "Are Good Samaritans (other than licensed physicians or persons acting under the direction of a physician) who are licensed in the healing arts not entitled to the defense provided by Section 22.04(k)(1)(B) of the Texas Penal Code for their good-faith conduct in an emergency?" (ground for review number three). We granted the appellant's petition in order to decide whether the divided court of appeals correctly construed the statutory defense.[12] Given our disposition of the appellant's first two grounds for review, we dismiss her third ground as moot.

## ANALYSIS

### Did the Court of Appeals Apply the Proper Standard?

■ We turn first to the appellant's ground for review number one, in which she argues that the court of appeals used the wrong legal standard in determining whether the trial court erred in denying her requested special charge on the Good Samaritan defense. The appellant argues that the correct standard is the "well-established 'raised-by-the-evidence' test," but she fails to explain how that supposed standard differs from the standard used by the court of appeals. Certainly, the phrase "raised by the evidence," as used by the appellant, has no intrinsic meaning; it must be defined in some way.

In Texas Penal Code § 2.03(c), the Legislature mandated that "[t]he issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense."[13] Thus, the question of what legal standard must be used by a court in determining whether, upon request, a defensive issue must be submitted to the jury, is really a question of statutory interpretation: What did the Legislature mean, in § 2.03(c), by the phrase "evidence ... supporting the defense"?

■ The answer to that question may be found in our precedents. We have noted before that, for the purposes of § 2.03(c), a defense is supported (or "raised") if there is evidence in the record making a prima facie case for the defense.[14] A prima facie case is that "minimum quantum of evidence necessary to support a rational inference that [an] allegation of fact is true."[15] We have also stated that, under § 2.03(c), a defendant "bears the burden of production" with respect to a defense.[16] But, of course, a "burden of production" is nothing more than a burden of making a prima facie case.[17]

■ In short, under § 2.03(c), a defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is

12. *See* Tex.R.App. P. 66.3(d) & (e).

13. Texas Penal Code § 2.03(c).

14. *Richardson v. State,* 622 S.W.2d 852, 856 (Tex.Crim.App.1981) (op. on reh'g); *Garcia v. State,* 528 S.W.2d 604, 605 (Tex.Crim.App. 1975).

15. *Tompkins v. State,* 774 S.W.2d 195, 201 (Tex.Crim.App.1987), *aff'd,* 490 U.S. 754, 109 S.Ct. 2180, 104 L.Ed.2d 834 (1989).

16. *Zuliani v. State,* 97 S.W.3d 589, 594 (Tex. Crim.App.2003); *Saxton v. State,* 804 S.W.2d 910, 914 (Tex.Crim.App.1991).

17. K. Broun (ed.), *McCormick on Evidence* § 338 at 479 (6th ed.2006); 31A C.J.S. *Evidence* § 120 (1996).

true.[18] In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven.[19] If a defense is supported by the evidence, then the defendant is entitled to an instruction on that defense, even if the evidence supporting the defense is weak or contradicted, and even if the trial court is of the opinion that the evidence is not credible.[20] But the evidence must be such that it will support a rational jury finding as to each element of the defense.

■ The requirement that the evidence must rationally support a jury finding before a defensive instruction is required serves to preserve the integrity of the jury as the factfinder by ensuring that it is instructed as to a defense only when, given the evidence, that defense is a rational alternative to the defendant's criminal liability.[21] If a jury were instructed as to a defense even though the evidence did not rationally support it, then the instruction would constitute an invitation to the jury to return a verdict based on speculation.[22] Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law.[23]

As far back as 1937, we held that "[c]ourts are only required to submit [defensive] theories of cases when same are supported by some testimony of sufficient cogence and substance to make it appear, at least with some degree of likelihood, that there could be a finding by the jury in response to such suggested issue."[24] That is still the rule today. The court of appeals utilized the correct legal standard. We overrule the appellant's ground for review number one.

### Did the Evidence Raise the Good Samaritan Defense?

■ We turn next to the appellant's ground for review number two, in which she argues that the court of appeals erred in holding that the evidence adduced at trial did not raise the Good Samaritan defense. Texas Penal Code § 22.04 provides, in relevant part, that "[a] person commits an offense if he ... recklessly ... by act ... causes to a child ... serious bodily injury."[25] The statute goes on to provide that "[i]t is a defense to prosecution under this section that the act ... consisted of ... emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts."[26] This latter portion of

18. *See Wilson v. State*, 777 S.W.2d 823, 825 (Tex.App.-Austin 1989), *aff'd*, 853 S.W.2d 547 (Tex.Crim.App.1993); 23A C.J.S. *Criminal Law* § 1787 (2006). The "rational-juror" standard enunciated by the court of appeals is the same standard stated in different language.

19. *See* K. Broun (ed.), *McCormick on Evidence* § 338 (6th ed.2006).

20. *E.g., Arnold v. State*, 742 S.W.2d 10, 13 (Tex.Crim.App.1987).

21. *Cf. Arevalo v. State*, 943 S.W.2d 887, 889 (Tex.Crim.App.1997) ("[T]he jury is instructed as to a lesser included offense only when [given the evidence adduced at trial] that of-

fense constitutes a valid, rational alternative to the charged offense.").

22. *See* P. Robinson, *Criminal Law Defenses* § 3(b) (1984).

23. *Wilson v. State*, 777 S.W.2d at 825; S. Childress & M. Davis, 2 *Federal Standards of Review* § 11.29 (10th ed.1999).

24. *Nickens v. State*, 131 Tex.Crim. 510, 514, 100 S.W.2d 363, 365 (1937).

25. Tex. Penal Code § 22.04(a)(1).

26. *Id.* § 22.04(k)(1)(B), since recodified without substantive change as § 22.04(k)(2).

the statute we refer to as the Good Samaritan defense.

The Good Samaritan defense is, on its face, a confession-and-avoidance or "justification" type of defense.[27] Section 22.04(k)(1)(B) operates as a kind of particularized example of the justification of necessity, applicable specifically in prosecutions for injury to a child.[28] Section 9.22 of the Penal Code begins: "Conduct is justified if...." "Conduct," in turn, is defined in Section 1.07(a)(10) of the Penal Code to mean "an act or omission *and its accompanying mental state.*"[29] It is a defense to criminal responsibility, under Section 9.02 of the Penal Code, if the criminal "conduct" is "justified." This justification, by definition, does not negate any element of the offense, including culpable intent; it only excuses what would otherwise constitute criminal conduct. From this it follows that evidence in a prosecution for injury to a child that does no more than negate the inference that the defendant caused the injury intentionally, knowingly, recklessly, or in some instances, with criminal negligence, does not raise the defense. The appellant is not entitled to a defensive instruction with respect to evidence that does nothing more than negate an element of the offense.[30]

■ We have said with respect to defenses such as necessity and self defense that when the defensive evidence merely negates the necessary culpable mental state, it will not suffice to entitle the defendant to a defensive instruction. Rather, a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes the justification to excuse the otherwise criminal conduct. For example, in *Young v. State,* we observed that "[i]n order to raise necessity, a defendant admits violating the statute under which he is charged and then offers necessity as a justification which weighs against imposing a criminal punishment for the act or acts which violated the statute."[31] We held that Young himself was not entitled to a necessity instruction because he merely "argued he did not commit the offense because he did not have the requisite intent and he did not perform the actions the State alleged."[32] Similarly, in *Ex parte Nailor,* we held that the defendant was not entitled to a jury instruction on self defense because his defensive evidence did not show confession and avoidance, but only a lack of the required culpable act and *mens rea.*[33]

In the instant case, the appellant asserts that the act by which she administered emergency medical care, with the requisite good faith and reasonable care, was the CPR she conducted in order to try to get the child breathing again. She would be

**27.** "[A] justification defense is one that defines conduct otherwise criminal, which under the circumstances is socially acceptable and which deserves neither criminal liability nor even censure." W. LaFave, *Substantive Criminal Law* § 9.1(a)(3) at 7 (2nd ed.2003) (internal quotes omitted).

**28.** *See* TEX. PENAL CODE §§ 9.02 & 9.22.

**29.** TEX. PENAL CODE § 1.07(a)(10) (emphasis added).

**30.** *E.g., Ortiz v. State,* 93 S.W.3d 79, 92 (Tex. Crim.App.2002); *Solomon v. State,* 49 S.W.3d 356, 368 (Tex.Crim.App.2001); *Giesberg v. State,* 984 S.W.2d 245, 250 (Tex.Crim.App. 1998). *See* George E. Dix & Robert O. Dawson, 43 TEXAS PRACTICE: CRIMINAL PRACTICE AND PROCEDURE § 36.43 (2d ed.2001).

**31.** 991 S.W.2d 835, 838 (Tex.Crim.App.1999).

**32.** *Id.* at 839.

**33.** 149 S.W.3d 125, 132–34 (Tex.Crim.App. 2004).

entitled to the Good Samaritan defense under Section 22.04(k) only if the jury could have found that it was this particular act that actually caused the child's head injury.[34] Dr. Hernandez's preliminary medical report (albeit not his testimony) concluded that the head injury "is probably the result of aggressive, cardio-pulmonary resuscitation[.]" Hence, there is some evidence from which the jury could reasonably have found (but was certainly not required to find) that it was the appellant's attempted CPR that caused the head injury. The next question is what the evidence shows the appellant's mental state was, if any, specifically with respect to causing the head injury (if she did) in that particular way. If there is no indication she harbored any culpable mental state *at all* with respect to causing the child's head injury while administering the CPR, she would not be entitled to the defensive instruction.[35]

The appellant points to no particular evidence in the record from which it could rationally be inferred that she harbored some culpable mental state with respect to causing a head injury in the course of administering CPR. There is only Dr. Hernandez's initial conclusion in his written report that it could have been the CPR that actually *caused* the head injury. This purports to establish nothing, however, with respect to whether the appellant administered the CPR with any particular mental state specifically with respect to causing a head injury. As in *Young* and *Nailor*, the appellant's defensive posture throughout trial seemed to be that she performed the CPR without any conscious awareness whatsoever that she might thereby be causing the child some head injury. This defensive posture serves only to negate the culpable mental element of the offense. Under these circumstances, a charge to the jury requiring it to find every constituent element of the offense to a level of confidence beyond a reasonable doubt before convicting the appellant was all that was required.

## CONCLUSION

For these reasons we hold that the trial court did not err in refusing to submit the defensive instruction to the jury. Therefore, albeit for reasons somewhat different than those expressed by the court of appeals in its opinion below, we affirm its judgment affirming the judgment of the trial court.[36]

---

**34.** If the jury believed, under the circumstances, that it was by some other act that the appellant injured the child, then obviously it would have no occasion to consider whether the defense applied, since it would have rejected the inference that the injury resulted from "emergency medical care."

**35.** That is to say, if there is no rational basis in the evidence for the jury to conclude that she administered the CPR with the conscious objective to, or was reasonably certain that she would, or was at least consciously indifferent *whether* she would, cause the head injury, then she would not be entitled to the jury instruction. *See* TEX. PENAL CODE § 6.03(a) ("A person acts intentionally, or with intent, with respect to ... a result of his conduct when it is his conscious objective or desire to ... cause the result."); § 6.03(b) ("A person acts knowingly, or with knowledge, with respect to a result of his conduct when he is aware that his conduct is reasonably certain to cause the result."); § 6.03(c) ("A person acts recklessly, or is reckless, with respect to ... the result of his conduct when he is aware of but consciously disregards a substantial and unjustifiable risk that ... the result will occur."). We have said on any number of occasions that injury to a child is a result-of-conduct type of offense. *E.g., Jefferson v. State,* 189 S.W.3d 305, 312 (Tex.Crim.App.2006). The appellant was not charged in the indictment with causing injury to the child by criminal negligence, nor did she seek to have the jury authorized to convict her for that lesser included offense.

**36.** Given this disposition, we need not reach the appellant's third ground for review.

JOHNSON, J., filed a dissenting opinion.

HOLCOMB, J., filed a dissenting opinion.

WOMACK, J., dissented.

JOHNSON, J., filed a dissenting opinion.

The state's theory in this case was that appellant became frustrated with the crying of the young victim and shook him or struck him, thereby inflicting the injuries that caused his death and thereafter deciding to blame his injuries on her disabled daughter. Michael Gaudet, a detective in the sheriff's office who had interviewed appellant at the hospital on the day of the injury, testified that he had asked appellant if she had dropped Schuyler. She denied any such conduct. He testified that he then asked her who else might have dropped Schuyler, and appellant related an incident two days earlier in which her disabled daughter, Melissa, may have dropped Schuyler while appellant was out of the room. The officer also testified that appellant told him that there were no apparent injuries, that he appeared to be uninjured, and that he cried for a time, then "settled down." He did not testify as to any attempt by appellant to blame Melissa for Schuyler's injuries.

The state's medical evidence from four physicians indicated that there were no visible external injuries or skull fractures, but the autopsy revealed diffuse swelling and hemorrhaging in the brain case of a type that would cause symptoms in no

more than six hours. The consensus of medical opinion was that Schuyler's injuries supported a scenario in which Schuyler had been recently shaken, but did not comport with a fall from a low height or an injury from two days before appellant's call to 911. Schuyler's medical records included a report from a pediatric neurologist, who opined that at least part of the hemorrhaging could have resulted from "aggressive" CPR.

Appellant testified that Schuyler stopped breathing, that she called 911 for help, that the 911 operator coached her on how to administer CPR, and that she performed CPR on Schuyler as instructed by the 911 operator. Her testimony on this issue was corroborated by the 911 audio tapes and the testimony of the responding police officer.

Her trial counsel questioned her about her conversation with Gaudet. She testified that he asked her how Schuyler's head could have been bumped. She then related the incident with Melissa and reiterated that Schuyler appeared uninjured. At no point in her testimony about her conversation with Gaudet, or in Gaudet's testimony about his conversation with appellant, was there any assertion that appellant stated or implied that the fatal injury was inflicted by Melissa. The only witness who took that position was Donna Dyer, a jailhouse snitch.

Appellant identified her job a "medical assistant," a position which may include certification, but is not licensed by the State of Texas as a "healing art."[1] Her

---

1. Medical assistant programs are generally taught in vocational schools and community and junior colleges in one(certification) or two-year programs (associate degree), but a medical assistant may be trained on the job. The duties are general and tend to office administration and minor medical procedures such as basic on-site laboratory tests, record-

ing vital signs, and administering medications as directed by a physician. Occupational Outlook Handbook 2006–07, United States Department of Labor, Bureau of Labor Statistics Bulletin 2600, www.bls.gov/oco/ocos164. htm. Medical assistants are not regulated by the Texas Occupations Code. Appellant's description of her title and duties indicates that

claim has always been that, if she injured Schuyler, it was during her efforts to perform CPR, that she is not "licensed in the healing arts," and that she was therefore entitled to a jury instruction on the Good Samaritan defense: "It is a defense to prosecution under this section that the act or omission consisted of: ... (B) emergency medical care administered in good faith and with reasonable care by a person not licensed in the healing arts." TEX. PENAL CODE § 22.04(k)(1)(B).

Our precedent is consistent in saying that a jury instruction must be given on a defense that "is raised by the evidence." "In determining whether the evidence raises the issue of a defensive charge, this Court must consider all the evidence raised at trial, regardless of the strength of the evidence or whether it is controverted." *Reese v. State,* 877 S.W.2d 328, 333 (Tex.Crim.App.1994)(quoting *Booth v. State,* 679 S.W.2d 498, 500 (Tex.Crim.App. 1984)). "This Court has consistently held that an accused is entitled to an instruction on every defensive issue raised by the evidence.... This is true regardless of whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of this evidence.... It is also well settled that a defendant's testimony alone is sufficient to raise a defensive issue requiring an instruction in the jury charge.... This is particularly true when, as in the case here, appellant made a proper and timely request for such a charge." *Hayes v. State,* 728 S.W.2d 804, 807 (Tex.Crim.App.1987) (citations omitted). *See also Ferrel v. State,* 55 S.W.3d 586, 591 (Tex.Crim.App. 2001); *Muniz v. State,* 851 S.W.2d 238, 254 (Tex.Crim.App.1993)(evidence which raises the issue may be strong, weak, contradicted, unimpeached, or unbelievable). "In determining whether any defensive charge should be given, the credibility of evidence or whether it is controverted or conflicts with other evidence in the case may not be considered. When a defensive theory is raised by evidence from any source and a charge is properly requested, it must be submitted to the jury.... This rule is designed to insure that the jury, not the judge will decide the relative credibility of the evidence. When a judge refuses to give an instruction on a defensive issue because the evidence supporting it is weak or unbelievable, he effectively substitutes his judgment on the weight of the evidence for that of the jury. The weight of evidence in support of an instruction is immaterial." *Woodfox v. State,* 742 S.W.2d 408, 409–10 (Tex.Crim.App.1987) (citations omitted.). *See also Miller v. State,* 815 S.W.2d 582, 585 (Tex.Crim.App.1991). The court of appeals' statement that an "element of the defense is 'raised' if, viewing the evidence in the light most favorable to the defendant, *there is evidence that a rational juror could accept as sufficient to prove that element*" (emphasis added) is a far cry from the consistent and long-standing standard in our case law: "it is well settled that a defendant's testimony

---

she falls into this job description and that she confused certification with licensing.

Physicians assistants, on the other hand, are required by all states to complete an accredited education program, usually affiliated with medical schools or four-year colleges, and to pass a national examination in order to obtain a license. In Texas, physicians assistants are regulated under TEX. OCC. CODE Ch. 204. They actually practice medicine under the supervision of a physician. They are formally trained to provide diagnostic, therapeutic, and preventative health care and may prescribe medication and assist during surgery. In rural areas, they may be the principal health-care providers. Occupational Outlook Handbook 2006–07, United States Department of Labor, Bureau of Labor Statistics Bulletin 2600, www.bls. gov/oco/ocos081.htm.

alone is sufficient to raise a defensive issue requiring an instruction in the jury charge" and that this is true "regardless of whether such evidence is strong or weak, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of this evidence." Our precedent makes it abundantly clear that the evidence in support of the defense may be entirely unbelievable and fantastic, but once that evidence is introduced, an instruction is required.

Appellant testified that she administered CPR as instructed by the 911 operator, an action that clearly falls under "emergency medical care." It was for the jury to decide whether the injuries resulted from the CPR or from another source and, if from the CPR, whether the CPR was done in good faith and with reasonable care. The trial court erred, as did the court of appeals, in finding that the defense was not raised.

Appellant was charged with two felonies, (1) manslaughter and (2) injury to a child, an offense that may be any degree of felony from first-degree to state-jail felony depending on the extent of injury and *mens rea.* The jury convicted appellant only of recklessly causing serious bodily injury, a second-degree felony and the lowest degree that is possible for serious bodily injury. Because the jury determined that Schuyler's injuries were not inflicted intentionally or knowingly, it is conceivable that the jury, had it been told of the Good Samaritan defense, might have found for the appellant on that basis. Therein lies the harm to appellant.

Appellant was entitled to a charge on the Good Samaritan defense. She did not get such an instruction and was harmed by its lack. The conviction should be reversed and the case remanded to the trial court for a new trial. I respectfully dissent.

HOLCOMB, J., filed a dissenting opinion.

The jury at appellant's trial found that she was reckless when she injured her grandson, Schuyler Shaw. After reviewing the record, I conclude that, if the jury had been given the option, it might well have found that appellant's reckless injury of Schuyler occurred during the course of emergency medical care administered in good faith and with reasonable care.

My conclusion is based on the following evidence: (1) Dr. Hernandez's "Pediatric Consultation Report," written shortly after Schuyler arrived at Cook Children's Hospital on November 9, 2001, in which he expressed the view that Schuyler's "subarachnoid hemorrhagic" was probably the result of aggressive cardiopulmonary resuscitation (CPR); (2) Dr. Hernandez's trial testimony that Schuyler's "subarachnoid hemorrhage" was his principal injury; (3) appellant's testimony that her grandson, Schuyler, had a "heart condition," for which he was given medication daily; (4) her testimony that, on the day in question, she found Schuyler unresponsive and in respiratory distress, after which she frantically called 911 and commenced CPR; (5) her testimony that caring for Schuyler was not a burden and that she did so happily; (6) her demonstration to the jury of how she performed the CPR on Schuyler; (7) her testimony that she had training in the care of children and understood how to handle them properly; and (8) her testimony describing her relatively menial duties as an assistant to a pediatrician.

The jury, *which was in a position to judge appellant's demeanor on the witness stand and to see her courtroom demonstration of how she physically handled Schuyler,* could have rationally reconciled all of this evidence, along with all of the other evidence adduced at trial, and could have rationally concluded the following: (1) on the day in question, appellant did

find Schuyler unresponsive and with labored breathing, as she claimed; (2) she then frantically called 911 and followed the dispatcher's instructions to begin CPR; (3) in an attempt to save the child's life, she administered the CPR energetically and perhaps erroneously but in good faith and with reasonable care; (4) in the course of administering the CPR, she shook Schuyler, perhaps inadvertently, and caused his head to strike the bed's mattress, thereby causing his injuries; and (5) when she shook Schuyler and caused his head to strike the mattress, she was aware of but consciously disregarded a substantial and normally unjustifiable risk of injury. The jury also could have rationally concluded that the nature of appellant's employment and her overall conduct on the day in question were inconsistent with her being a licensed member of the healing arts and that she was, in fact, not a licensed member of the healing arts.

The majority concedes that "there is some evidence [Dr. Hernandez's medical report] from which the jury could reasonably have found ... that it was appellant's attempted CPR that caused [Schuyler's] head injury." Given the evidence at trial, recounted above, the jury also could reasonably have found that appellant, because of her frantic mental state upon finding Schuyler unresponsive and in respiratory distress, was reckless when she attempted the CPR on him.

As the majority points out, not much evidence is needed to raise a defense. All that is needed is some evidence, from any source, that would support a rational inference that each element of the defense is true. That minimal standard was met in this case.

I respectfully dissent.