**Opinion filed August 17, 2023**



In The

# Eleventh Court of Appeals

_____

## No. 11-21-00254-CR

_____

**JAYLENE ANN GREEN, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 161st District Court**

**Ector County, Texas**

**Trial Court Cause No. B-20-0393-CR**

## M E M O R A N D U M   O P I N I O N

On December 25, 2019, Rick Britton was outside grilling steaks, when his stepdaughter, Jaylene Ann Green (Appellant), used her cell phone to video record as she shot him in the neck at close range and as he bled out and died on the ground. Appellant, was charged by indictment for murder, which alleged that she intentionally and knowingly caused the death of her stepfather by shooting him with a firearm. *See* TEX. PENAL CODE ANN. § 19.02(b)(1) (West 2019). The jury found

Appellant guilty of murder as charged in the indictment and assessed Appellant's punishment at thirty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice and an $8,000 fine. The trial court sentenced Appellant accordingly. In her sole issue on appeal, Appellant challenges the trial court's refusal to submit Appellant's requested self-defense instruction in the trial court's charge. We affirm.

*Factual and Procedural History*

Appellant testified that, on December 25, 2019, she shot and killed her stepfather outside his home in Ector County. Appellant testified that she shot him with the intent to kill him, because she constantly felt threatened by him and that it was either "him or me."

According to Appellant, her stepfather first entered her life when she was two years old when he married her mother. When Appellant was eleven, her stepfather and her mother divorced, but when Appellant was sixteen, she moved in with her stepfather and lived with him for two years. Appellant testified that when Appellant was nineteen years old, she asked her stepfather for financial assistance, and her stepfather offered to provide the requested financial assistance in exchange for sex. Appellant accepted the offer. This exchange continued intermittently, when Appellant was in need of money, up until her stepfather's murder. Appellant testified that her stepfather would occasionally threaten her and expected her to have sex with him whenever she visited him in Odessa. Appellant testified that, a few months before her stepfather's murder, during one of her visits, Appellant told him that she would not have sex with him and he got angry. Appellant testified that she then threw a candle at his head, and her stepfather then punched her very hard in the chest. She testified that, due to that injury she went to the emergency room, had a chest x-ray and used Lidocaine patches on her chest for three months.

2

In 2019, approximately seven years after the first time her stepfather had paid Appellant for sex, Appellant was placed on probation for two DUIs. Appellant testified that she needed a stable living environment according to the terms of her probation, and that her stepfather offered to provide that for her. Her DUI probation in Colorado was transferred to Ector County, Texas. Despite testifying that she felt threatened by her stepfather, Appellant moved in with him approximately a week before the murder. Appellant testified that her stepfather expected to "get lucky" every night while she was living with him and that she was in constant fear for her life, but that she felt she had to stay there to meet the terms of her probation.

Appellant testified that her life was unstable; she was a "high functioning alcoholic," and her stepfather was a source of financial help. The record includes her admissions that (1) the alleged sexual aspect of Appellant's relationship with her stepfather began consensually at age nineteen in exchange for financial help and his permission to consume alcohol; (2) shortly before the murder she took sexual photographs of herself and offered to sell them to her stepfather; (3) she had texted him with offers of sex for money in the past; (4) he paid her credit card bills, bought her a car, paid for the vehicle's gas and insurance; (5) she stole checks from him, filled them out and cashed them without permission; and (6) there was a pattern of her repeatedly returning to her stepfather, having sexual relations at his insistence, and of him taking care of Appellant financially.

In the months leading up to the murder, prior to having moved in with her stepfather again, Appellant told a friend multiple times of her desire to kill her stepfather. So, clearly, her ideation of killing her stepfather was not "a spur of the moment thing." Appellant testified that she had been contemplating it for months.

Appellant testified that the morning of the murder, her stepfather demanded and received sex from Appellant. He told Appellant that he would cook her a steak

for dinner that night and expected to have sexual relations after dinner. While observing her stepfather that evening standing at the grill outside cooking steaks, she explained that she "wanted to see the joy and, . . . the happiness that could come from that," ostensibly sharing a meal on Christmas Day, but that because she "just knew what was coming afterwards, that it was not happy or joyous to [her]." Appellant testified that, "[she] had just seen the steak dinner, and [she] just . . . snapped." Appellant retrieved a gun from inside the home, walked up to her stepfather, and shot him in the neck. Appellant video recorded the shooting with her cell phone. Appellant called a friend, who did not answer, and then texted the friend "he's dead." It was only after this exchange that Appellant called 9-1-1.

During the charge conference, Appellant requested a self-defense instruction, which the trial court denied. The jury found Appellant guilty of murder as alleged in the indictment, and assessed Appellant's punishment at thirty years' imprisonment in the Institutional Division of the Texas Department of Criminal Justice and an $8,000 fine.

*Standard of Review and Applicable Law*

A review of an alleged jury charge error involves two steps. *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984) (op. on reh'g); *Graves v. State*, 452 S.W.3d 907, 910 (Tex. App.—Texarkana 2014, pet. ref'd). "We first determine whether error exists." *Graves*, 452 S.W.3d at 910 (citing *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005)). "If there is no error, our analysis ends." *Id.* (citing *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012)). Second, if there is error, we must determine if the error resulted in sufficient harm to require reversal. *Ngo*, 175 S.W.3d at 743–44.

"Regardless of the strength or credibility of the evidence, a defendant is entitled to an instruction on any defensive issue that is raised by the evidence."

4

*Jordan v. State*, 593 S.W.3d 340, 343 (Tex. Crim. App. 2020) (citing *Hamel v. State*, 916 S.W.2d 491, 493 (Tex. Crim. App. 1996)). "A defensive issue is raised by the evidence if there is sufficient evidence to support a rational jury finding as to each element of the defense." *Id.* (citing *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007)). "We view the evidence in the light most favorable to the defendant's requested defensive instruction." *Id.* (citing *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017)). A trial court errs if it refuses to submit a requested self-defense instruction if there is some evidence, viewed in the light most favorable to the defendant, that will support its elements. *Id.*

"[I]f the evidence, viewed in the light most favorable to the defendant, does not establish self-defense, the defendant is not entitled to an instruction on the issue." *Gaspar v. State*, 327 S.W.3d 349, 356 (Tex. App.—Texarkana 2010, no pet.) (quoting *Ferrel v. State*, 55 S.W.3d 586, 591 (Tex. Crim. App. 2001)). "It is well settled that an accused has the right to an instruction on any defensive issue raised by the evidence, whether that evidence is weak or strong, unimpeached or contradicted, and regardless of what the trial court may or may not think about the credibility of the evidence." *Granger v. State*, 3 S.W.3d 36, 38 (Tex. Crim. App. 1999). However, if the evidence viewed in a light favorable to appellant does not establish the defensive issue, an instruction is not required. *Id.* "The defendant's testimony alone may be sufficient to raise a defensive theory requiring a charge." *Dyson v. State*, 672 S.W.2d 460, 463 (Tex. Crim. App. 1984). "Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law." *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

Not all charge errors require reversal on appeal. *Reeves v. State*, 420 S.W.3d 812, 816 (Tex. Crim. App. 2013). If the charge is erroneous, then on appeal we must first determine if the defendant objected to the erroneous charge. *Id.* If the defendant

objected to the erroneous charge, we will reverse if the record shows that the error caused "some harm." *Id.* Conversely, if the defendant failed to object, an appellate court may only reverse upon a finding of "egregious harm." *Id.* Egregious harm is harm that denies the defendant a fair and impartial trial. *Nava v. State*, 415 S.W.3d 289, 298 (Tex. Crim. App. 2013). This is a difficult standard to meet, and the harm must be shown in the record. *Reeves*, 420 S.W.3d at 816. To assess harm, the appellate court reviews the *Almanza* factors: (1) the jury charge itself; (2) the state of the evidence, including weight and probative value; (3) counsel's arguments; and (4) any other relevant information in the trial record. *Vega v. State*, 394 S.W.3d 514, 521 (Tex. Crim. App. 2013); *Almanza*, 686 S.W.2d at 171.

Section 9.31 of the Texas Penal Code states that "a person is justified in using force against another when and to the degree the actor reasonably believes the force is *immediately necessary* to protect . . . against the other's use or attempted use of unlawful force." PENAL § 9.31(a) (emphasis added); *see Henley v. State*, 493 S.W.3d 77, 89 (Tex. Crim. App. 2016). It further clarifies, in relevant part, that the actor's belief that force was immediately necessary is presumed to be reasonable if the actor knew that the person against whom force was used was "committing or attempting to commit . . . sexual assault." *Id.* § 9.31(a)(1)(C). The use of *deadly* force against another is justified "if the actor would be justified in using force against the other under Section 9.31," and the actor reasonably believes that deadly force is *immediately necessary* to prevent the other's imminent commission of sexual assault. *Id.* § 9.32(a). A reasonable belief is a belief that would be held by an ordinary and prudent person in the same circumstances as the actor. PENAL § 01.07(a)(42) (West 2021). "The use of force against another is not justified in response to verbal provocation alone." *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017).

*Analysis*

In her sole issue on appeal, Appellant challenges the trial court's refusal to include Appellant's requested self-defense instruction in the trial court's charge. In her brief, Appellant asserts that she was entitled to a self-defense instruction regarding her use of deadly force pursuant to Sections 9.32(a)(1), (a)(2)(B) (Deadly Force in Defense of Person) and Section 9.31(a)(1)(C) (Self-Defense). To be applicable, these sections of the Penal Code require that Appellant "reasonably believe[] [that] the deadly force [was] immediately necessary to prevent [her stepfather's] imminent commission of sexual assault,"; or, at least to be entitled to the presumption that her belief was reasonable, that at the time, her stepfather "was committing or attempting to commit" sexual assault. *See* PENAL § 9.32(a)(2)(B), (b)(1)(C); *Barron v. State*, 630 S.W.3d 392, 404 (Tex. App.—Eastland 2021, pet. ref'd). During the charge conference, the trial court questioned whether evidence was presented to entitle Appellant to the instruction, particularly whether evidence had been presented that her deadly force was immediately necessary or whether harm to Appellant was imminent.

Appellant contends that the evidence presented at trial included some evidence that the shooting was done in self-defense to avoid being sexually assaulted by her stepfather and that, under the *Almanza* standard, she suffered actual harm by the exclusion of the requested self-defense instruction. In this regard, Appellant argues that her numerous accounts of sexual assault and the physical and mental abuse that she was subjected to, along with her stepfather's demand to have sex the evening of the shooting, caused her to reasonably believe that it was immediately necessary for her to use deadly force against her stepfather to protect herself from being sexually assaulted by him.

Sections 9.31(a)(1)(C) and 9.32(a)(2)(B) each provide a presumption that an actor's belief that their use of force or deadly force, respectively, was immediately

7

necessary is reasonable when the person against whom the force is used commits or attempts to commit sexual assault. There is no applicable presumption here. Appellant's cell phone video clearly shows that her stepfather was not, at the time of the commission of the murder, committing or attempting to commit sexual assault against Appellant such that the circumstance would entitle Appellant to a presumption under either Section 9.31(a)(1)(C) or 9.32(a)(2)(B). Further, there is no evidence that Appellant's stepfather was sexually assaulting or was attempting to sexually assault Appellant at the time she shot him.

Appellant testified that he had not been physically violent during this last occasion of moving in with him in the week prior to the murder. There is no evidence of violence or a threat of violence by her stepfather if there was future resistance to his sexual advances toward Appellant, or if she decided to leave as she had done many times previously. In the videos recorded by Appellant on the day of the murder, including the video of the actual shooting, the stepfather does not appear to be or sound mad or angry, and he does not threaten Appellant.

Appellant was questioned multiple times about the obvious option of just leaving. Appellant testified that she would stay a week or two, and that she had the freedom to leave and go wherever she wanted. She chose to be around her stepfather and she did not testify to any threat that prevented her from leaving or compelling her to stay, other than his financial help while she lived with him. Appellant testified that she felt "immediate threat" at "all times," in response to trial counsel's leading question, but Appellant provided no specific words nor described any actions of an immediate threat or harm by her stepfather. She admitted that, at the time of the shooting, her stepfather had not attempted and did not attempt to strike her, that he had no gun or knife in his hand, and that he did not threaten her. Appellant admitted that, in approaching her stepfather, she walked by two sets of car keys on the kitchen

8

counter that could have been used to leave, instead of staying and shooting her stepfather. He was not threatening her or sexually assaulting her or attempting to do so at the time of the shooting. Instead, the video captures Appellant walking up to her stepfather, who appears to be unarmed and standing at a grill, and shooting him in the neck. Appellant admitted that, at the time she approached her stepfather, he was unarmed and was not threatening her or "raping" her.

Appellant asserts on appeal that—through her testimony—she raised the issue of self-defense. The State argues that no evidence was admitted to support or require a self-defense instruction. We agree. There was no evidence of an immediate need for her to use deadly force. Her stepfather was not committing, or attempting to commit sexual assault, imminently or otherwise, at the time Appellant shot him. *See* PENAL §§ 9.32 and 9.31. Rather, Appellant described a pattern of financial duress-induced conduct that she repeatedly subjected herself to, but in which she was free to walk away at any time, and often did. But then she continued to return.

In the self-defense context, force is "immediately necessary" to protect oneself from a person's use of unlawful force only if it is needed at that moment—i.e., "when a split second decision is required." *Henley*, 493 S.W.3d at 89–90. Appellant's deadly force was not immediately necessary. Instead, Appellant explained that she finally "just snapped" and took her stepfather's life. *See Reynolds v. State*, No. 07-11-00500-CR, 2012 WL 6621317, at *4 (Tex. App.—Amarillo [Panel Op.] Dec. 19, 2012, no pet.) (mem. op., not designated for publication) (appellant's statement that complainant's act of kicking him caused him to "snap" and strike the victim as an act of retaliation was not self-defense); *Daisy v. State*, No. 05-01-01791-CR, 2002 WL 31528723, at *2 (Tex. App.—Dallas Nov. 15, 2002, no pet.) (not designated for publication) (an act of retaliation was not self-defense).

At the time of the murder, Appellant, who was in no immediate danger from her stepfather, became the aggressor and was intending to retaliate against him. This type of retaliatory behavior—which may prompt a victim to act in such a way as to defend herself—does not fall within the ambit of self-defense.[1] *Elrod v. State*, No. 06-22-00130-CR, 2023 WL 4485954, at *9 (Tex. App.—Texarkana July 12, 2023, no pet. h.) (mem. op., not designated for publication). This is because "[s]elf-defense implies defensive and not offensive acts." *Witty v. State*, 203 S.W.2d 212, 218 (Tex. Crim. App. 1947); *Wilcox v. State*, No. 06-22-00100-CR, 2023 WL 2546504, at *4 (Tex. App.—Texarkana Mar. 17, 2023, pet. ref'd) (mem. op., not designated for publication); *see also Mitchell v. State*, 590 S.W.3d 597, 604–05 (Tex. App.—Houston [1st Dist.] 2019, no pet.) (defendant was not entitled to use deadly force when an unarmed aggressor let defendant go before defendant picked up a gun and fired at the victim); *Sanchez v. State*, 418 S.W.3d 302, 310 (Tex. App.—Fort Worth 2013, pet. ref'd) (defendant "acted out of anger, not protective instinct, in pursuing the unarmed [complainant]"); *Wilson v. State*, No. 01-17-00788-CR, 2019 WL 346892, at *3 (Tex. App.—Houston [1st Dist.] Jan. 29, 2019, pet. ref'd) (mem. op., not designated for publication) (no evidence of self-defense when defendant shot a man who stepped back and threw his hands up after wrestling with defendant).

Appellant did not show that there was an immediate need for her to use deadly force against her stepfather and thus failed to meet the requirements of self-defense described in the Penal Code. We conclude that Appellant was not entitled to a jury instruction on self-defense; therefore, the trial court did not abuse its discretion by refusing to include such an instruction in the charge. *See Henley*, 493 S.W.3d at 89–91; *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013); *Wesbrook v.*

---

[1]We note that, because there was no evidence that entitled Appellant to a self-defense instruction under Section 9.31, Appellant necessarily was not entitled to a self-defense instruction under Section 9.32. *See* PENAL § 9.32(a)(1) (the actor must first be justified in using force against the other under Section 9.31).

*State*, 29 S.W.3d 103, 122 (Tex. Crim. App. 2000).  Because we have concluded that the trial court did not err in refusing to submit the requested instruction, we need not conduct a harm analysis.  *See Ngo*, 175 S.W.3d at 743–44; *see also* TEX. R. APP. P. 47.1.

We overrule Appellant's sole issue.

*This Court's Ruling*

We affirm the judgment of the trial court.


W. BRUCE WILLIAMS

JUSTICE


August 17, 2023

Do not publish.  *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Bailey, C.J.,
Trotter, J., and Williams, J.