**Affirmed and Opinion Filed July 3, 2013**



In The

# Court of Appeals
# Fifth District of Texas at Dallas

### No. 05-12-00743-CR
### No. 05-12-00744-CR

**ANTHONY EUGENE JOHNSON, Appellant**

V.

**THE STATE OF TEXAS, Appellee**

On Appeal from the 292nd Judicial District Court
Dallas County, Texas
Trial Court Cause Nos. F08-71994-V & F11-00273-V

## MEMORANDUM OPINION

Before Justices Francis, Lang, and Evans
Opinion by Justice Francis

Anthony Eugene Johnson appeals his convictions for aggravated assault with a deadly weapon and manslaughter. After finding appellant guilty of both offenses, the jury assessed punishment at ten years and twenty years in prison, respectively. In four points of error, appellant claims the trial court erred by denying his statutory and constitutional rights to an instruction on self defense in each case. We affirm.

What started as a fist fight between two groups of young men at a Shell gas station in Dallas, ended as a multiple shooting after appellant produced a gun from inside a car and began firing. The gun "went off" numerous times, leaving two men wounded and one dead at the scene. Appellant was convicted of the aggravated assault of Brandon Sharp. The jury was

instructed on murder and the lesser included offenses of manslaughter and deadly conduct in the death of Giovann Scott and found appellant guilty of manslaughter.

In his first two points of error, appellant claims the trial court erred by denying his request for an instruction on self defense in each case. Appellant contends his testimony as well as Brandon Sharp's testimony raised the issue in both cases. We disagree.

We use a two-step process in reviewing jury charge error. *Ngo v. State*, 175 S.W.3d 738, 743 (Tex. Crim. App. 2005). First, we determine whether error exists in the charge. *Id*. If error does exist, we review the record to determine whether the error caused sufficient harm to require reversal of the conviction. *Id*. When the defendant properly objects to the error in the charge, reversal is required unless the error was harmless. *Id*.

A person is justified in using force against another when and to the degree the actor reasonably believes the force is immediately necessary to protect the actor against the other's use or attempted use of unlawful force. TEX. PENAL CODE ANN. § 9.31(a) (West 2011). A person is justified in using deadly force against another if the actor would be justified in using force against another under section 9.31 and when and to the degree the actor reasonably believes the deadly force is immediately necessary to protect the actor against the other's use or attempted use of unlawful deadly force. TEX. PENAL CODE ANN. § 9.32(a) (West 2011). A defendant is entitled to a charge on a defensive issue if raised by the evidence even if that evidence is weak or contradicted and regardless of whether the trial court finds the evidence credible. *Walters v. State*, 247 S.W.3d 204, 209 (Tex. Crim. App. 2007). Whether a defense is supported by the evidence is a sufficiency question reviewable on appeal as a question of law. *Shaw v. State*, 243 S.W.3d 647, 658 (Tex. Crim. App. 2007).

The State argues appellant was not entitled to an instruction on self defense because he failed to admit intentionally or knowingly shooting Giovann Scott or Brandon Sharp. To be entitled to an instruction on self-defense, a defendant is required first to admit the conduct charged in the indictment and then to offer evidence justifying the conduct. *See Jackson v. State*, 110 S.W.3d 626, 631 (Tex. App.—Houston [14th Dist.] 2003, pet. ref'd). Admitting the conduct, however, does not necessarily mean admitting the commission of every statutory element of the offense; rather, the defendant must "sufficiently admit to the commission of the offense." *Martinez v. State*, 775 S.W.2d 645, 647 (Tex. Crim. App. 1989) (stating denial of intent to kill did not preclude self defense when defendant admitted pulling out gun, firing shot into air, and having finger on trigger when fatal shot fired); *Alonzo v. State*, 353 S.W.3d 778, 783 (Tex. Crim. App. 2011) (instructions on self defense not precluded where mental state is reckless). Although appellant specifically denied intending to shoot anyone, including Giovann and Brandon, we conclude, as has the court of criminal appeals, that this alone does not preclude an instruction on self defense. *Id.* Thus, we turn to the record to determine whether self defense was raised by the evidence presented.

The jury heard multiple versions of what occurred at the Shell station from the sixteen witnesses who testified during the first phase of the trial. Our analysis focuses primarily on the testimony of appellant, James Lester, and Brandon Sharp. James testified that on the day of the shooting, he, Giovann, and Brandon went to the Shell station together in a red Buick. Three other men, identified as appellant, Robert Knox, and Ryan Harrison, arrived in a white, four-door Mercedes Benz and were parked by the gasoline pump. James stayed in the car while Brandon and Giovann went in the station. When they came back out, only Giovann got in the car while Brandon stayed outside talking loudly to appellant, Robert, and Ryan. James could tell

3

something was not right, so he stepped out of the car. Brandon and Robert continued talking; James walked to the passenger side of the Mercedes and asked appellant, who was sitting in the front passenger seat, if there was a problem. Appellant said no but that everyone needed to "move around."

James saw that Brandon and Robert began fighting, and Giovann, now out of the car, was standing behind him. Ryan got out of the Mercedes and began fighting with Giovann. James tried to break up the fight between Giovann and Ryan, but they did not listen to him. James looked back and saw Brandon run around the side of the Shell station and hide behind a column. He then saw appellant jump out of the car with a chrome pistol.

Appellant asked James what he wanted to do and James, putting his hands in the air, replied, "I don't want to do nothing, you have a pistol." Brandon came from behind the column and went toward appellant who started shooting at the ground. One bullet hit Brandon in the leg, making him fall back. James told the jury Brandon was trying to crawl backwards on the ground when appellant shot him in the stomach. Appellant then turned toward Giovann and Ryan and fired a couple of times. James said he did not have a gun or get a gun. He also denied that any friends other than Giovann and Brandon were there during the fighting.

Brandon testified he rode with Giovann and James to the Shell station to get some cigarettes. At the station, he saw Robert, whom he knew from previous encounters, including one time when Robert and his friends shot at Brandon and his "home boys," killing "some other dude." Robert was with two other men. Brandon and Robert started "talking trash" to each other. Robert tried to get in the Mercedes, but Brandon started hitting him. At this point, Brandon was focused on Robert and was not aware of where Robert's friends were until appellant came around the car with a gun.

4

Although appellant pointed the gun at Brandon's waist, Brandon stood in front of appellant because he did not think appellant would shoot him. According to Brandon, Giovann came around Brandon to hit appellant but appellant started shooting at Brandon's feet. The first bullet hit Brandon's upper right leg, near his crotch. Thinking he needed to get the gun away from appellant, Brandon tried to grab the gun but appellant shot him in the stomach. Brandon tried to run into the Shell station, but the people inside had locked the door. Brandon said appellant was the only person he saw with a gun that night. Brandon denied that his brother, C.J. Sharp, or any other friends were at the Shell station during the fighting.

Terry Wafer came to the Shell station that day to buy "bootleg CDs and DVDs." He saw the confrontation begin and the actual fight start. Wafer said he observed one individual run toward a red car, take out a gun and "stuff it in his pants." Wafer drove away as shots began to fire. Ashley Scott was doing her laundry near the Shell station, heard loud talk, and saw the fight begin. The only weapon she saw was the gun held by appellant. She fled before the shooting.

Appellant told the jury he borrowed his grandmother's white Mercedes and drove Robert and Ryan to the barber shop next door to the Shell station. When they left the barber shop, Robert got in the driver's seat, appellant sat in the front passenger seat, and Ryan rode in back. They drove next door to the Shell station and parked at the gas pump. Robert got out, pulled a gun off his hip, and placed it on the front seat before walking inside. According to appellant, Robert carried the gun because, two weeks earlier, someone tried to shoot him. Appellant took the gun and put it in the console between the two front seats.

A maroon or red Buick pulled into the parking lot. According to appellant, it had "a lot of dudes in it," two of whom got out and went inside the Shell station. They returned to the Buick, and a third man, later identified as Brandon, got out of the car and went inside. A few

minutes later, Robert came out of the Shell station, followed immediately by Brandon who was yelling and swearing. Robert came toward the car fast and "was scared." He got in the car and told appellant that Brandon was the "dude" who tried to kill him two weeks earlier. Robert then asked where his gun was but before he could do anything, Brandon reached in the car and began punching Robert. At that point, everyone in the Buick got out and rushed the Mercedes. Appellant said there were five or six guys and they pulled Ryan and Robert out of the car. At first, appellant tried to hold the car door shut but then he jumped out of the car to fight two unidentified men who had been trying to open his car door; he left the gun in the console.

Appellant fought the two men and was "getting the better of" them when one said to the other, "Man, go get the heater." Appellant understood "heater" to mean "gun." According to appellant, the second man "took off towards the car" while appellant continued to wrestle the first man. Appellant said he thought the second man was going for a gun so he "slammed" the first man, dove back to the car, and got the gun. When asked what he was thinking, he replied, "Once I slam him, in my mind all this is get the gun out the console, get the gun out the console."

After he got the gun, appellant jumped out of the car and pointed the gun at the ground. He said, "I'm not trying to shoot nobody. I'm not trying to do nothing to nobody. I just want to scare them away." He saw the second man coming back, holding something black. Although he did not actually see a gun, appellant said he knew it was a gun. Appellant said, "What's up now?" Brandon charged at him, trying to take the gun from him. They wrestled over the gun, and it "started going off. Once the gun started going off, [Brandon] took off running." Appellant turned around and saw a "big dark-skinned dude" choking Ryan, so he started "shooting the ground." The big guy ran off toward the other car. Feeling it was time to leave, appellant and his friends got in their car and drove off. Robert "took the gun away" from

appellant as soon as they got back into the car. Later, appellant realized Ryan had been shot. Appellant denied seeing Giovann at all and said Giovann was not the man choking Ryan. He thought he heard gunshots coming from another gun and did not know anyone had been shot, including Ryan.

On cross-examination, appellant said he did not point the gun at Brandon and did not know Brandon had been shot. When asked if he shot Brandon in self-defense or if it was an accident, appellant replied it was both. He stated he did not know if he shot Brandon and thought it was a possibility that someone else shot Brandon. Appellant "never aimed a gun at anybody to try to shoot anybody. The gun went off because Brandon grabbed [his] hand." When asked if he ever fired the gun at a person who was holding a gun, appellant said he "never pointed the gun" or "aimed the gun at anybody and fired the gun." After he and Brandon scuffled over the weapon and it went off, appellant "turned around and aimed the gun towards the ground, towards where my friend and the dark-skinned guy was fighting" and "I shot at the ground." He said he was trying to break up the fight and that his friend was being choked by a bigger, muscular "dude." The gun ultimately "locked back." Appellant also said he did not know who Giovann was or that he had been shot. Acknowledging ballistics evidence to the contrary, appellant doubted he fired the shot that killed Giovann.

In a videotaped interview with police, appellant initially denied firing any shots but ultimately admitted firing the gun. He called his mother on a cell phone, said an individual ran up to the car and then ran to get a pistol, and that he acted in self defense and "I had to" do it. Appellant told her one of the individuals tried to grab the gun, "it started going off" and he "lost it."

The bullet taken from the pelvis of Giovann during the autopsy was determined to have been fired from the gun used by appellant. The bullet did not have "significant damage" and ballistics testimony reflected it "unlikely" that the bullet struck a hard surface prior to striking Giovann.

Although appellant contends the above evidence was sufficient to entitle him to an instruction on self defense, we cannot agree. As previously noted, a party is entitled to use deadly force when and to the degree he reasonably believes such deadly force is immediately necessary to protect himself against an other's use or attempted use of deadly force. Thus, to be entitled to an instruction in these cases, the evidence had to show appellant reasonably believed he needed to use deadly force to protect himself against Giovann's or Brandon's use or attempted use of deadly force.

Appellant testified he took the gun out of the console because he believed the second man he had been fighting had gone to get a gun, but appellant never actually saw a gun during the incident. Appellant did not testify that, once appellant was armed, the second man threatened or attacked him. He did not testify where the second man was when appellant began shooting. In fact, the record is devoid of any evidence of the second man's actions or of his specific whereabouts once appellant exited the car with the gun and the gun "went off" during the scuffle over the gun with Brandon.

With respect to the aggravated assault of Brandon, although Brandon began the fight with Robert and later charged appellant, Brandon did not have a gun, and appellant knew Brandon did not have a gun. Appellant testified, "I didn't know that Brandon was shot when he was shot. He had grabbed my wrist and we were struggling over the gun." He thought it was "a possibility" that someone else shot Brandon. Appellant does not point to any evidence in the record, and our

8

review has shown none, to show appellant believed he needed to use deadly force because of Brandon's use or attempted use of deadly force.

As to Giovann, the evidence shows he was not the man that appellant saw choking Ryan and, based on the descriptions appellant gave of the men at the Shell station, Giovann was not the man appellant said he initially saw take something out of a car that he "knew was a gun." In fact, appellant said, "I never knew that a bullet had shot Giovann. I didn't even know who Giovann was." Although a ballistics expert testified otherwise, appellant continued to deny that he shot Giovann. There was no evidence from any source, including appellant's testimony, that Giovann was armed or that he was attacking appellant in any way. Thus, the evidence shows Giovann was not using or attempting to use deadly force when appellant shot Giovann. Under these facts, the trial court did not err by denying his request for a self-defense instruction for Giovann's death.

The cases cited by appellant in support of his argument that he acted in self defense are distinguishable from the facts in this case. In *Alonzo*, Rocha attacked the defendant with a metal spike and, during the struggle, Rocha was stabbed in the chest and died. *Alonzo*, 353 S.W.3d at 779. At trial, the jury was charged on murder, with the lesser included offenses of manslaughter and aggravated assault. The charge also included an instruction on self defense, but only with respect to the charge of murder. *Id.* The defendant was convicted of manslaughter. *Id.* The court of criminal appeals held that the trial court misapplied the law of self defense by applying it only to the murder charge and not the lesser included offenses of manslaughter and aggravated assault. *Id.* at 782. The court further held the testimony of the defendant that he did not intend to kill Rocha did not preclude an instruction on self defense in the face of evidence that the defendant "used deadly force against another when and to the degree he reasonably believed the

9

force was immediately necessary to protect himself against Rocha's use or attempted use of unlawful deadly force." *Id*. at 783. In this case, however, appellant was not responding in self defense to the use of deadly force by Brandon or Giovann or any other party to the fight. Although he heard someone say to go get the "heater" and said he saw a man coming back with what he "knew was a gun," appellant never actually saw a gun, and his level of force was not justified by the facts. And even if he pulled out the gun to scare everyone away and, in attempting to "use non-lethal force to end the confrontation, accidentally killed [or injured] his attacker," as was discussed in *Alonzo*, his use of deadly force in the first place would not be justified by these facts. *See id*.

In the second case cited by appellant, Tarrant County sheriff's deputies attempting to execute an arrest warrant, knocked on the defendant's apartment door several times and saw someone peeking out through the blinds. *Walker v. State*, No. 02-04-491-CR, 2006 WL 908698, at *1 (Fort Worth Apr. 6, 2006, pet. ref'd) (mem. op., not designated for publication). When no one answered, the door was forced open with a battering ram. A deputy kicked open a bedroom door, saw someone crouched on the floor pointing a gun at him, and was shot in the stomach. *Id*. The deputy closed the door and returned fire through the door, as did other officers, shooting the defendant nine times. In contrast, the defendant said he was in the bathroom of his apartment brushing his teeth when he heard noises and what he thought was a gunshot coming from inside the apartment. *Id*. Believing he was under attack from deadly force, he blindly fired two or three shots through the closed bedroom door, wounding a deputy. *Id*. Although the defendant sought an instruction on self defense, the trial court denied his request. *Id*. at *2. The court of appeals reversed the conviction for the failure to instruct the jury on self defense. *Id.*

Several factual distinctions exist between the *Walker* case and appellant's case. The defendant in *Walker* testified he fired in response to a gunshot he said he heard coming from within his apartment. In contrast, neither Brandon nor Giovann had a gun or fired at appellant. The defendant in *Walker* admitted to the conduct of firing the gun into the door. On the other hand, at trial, appellant did not admit the conduct in either offense. In the shooting of Brandon, appellant claimed the gun went off when Brandon grabbed his wrists. As for Giovann, despite ballistic evidence that he fired the weapon that killed Giovann, appellant testified someone else could have fired the shot. He did not know who Giovann was and did not know anyone had been shot as he drove away from the Shell station. Because we find the facts of *Alonzo* and *Walker* distinguishable, we are not persuaded by either of them.

Under the circumstances of these cases, we conclude the trial court did not err by denying appellant's request for a self-defense instruction in Brandon's assault or in Giovann's manslaughter. We overrule appellant's first and second points of error.

Having concluded the evidence did not raise self defense in either case and appellant was not entitled to the instruction, we need not address appellant's third and fourth points of error in which he claims the trial court violated his rights under the Sixth and Fourteenth Amendments to the United States Constitution by denying his request for self-defense instructions. *See* TEX. R. APP. P. 47.1. We overrule his four points of error.

We affirm the trial court's judgments.

Do Not Publish
Tex. R. App. P. 47.2(b)
120743F.U05

/Molly Francis/
MOLLY FRANCIS
JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTHONY EUGENE JOHNSON,
Appellant

No. 05-12-00743-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F08-71994-V.
Opinion delivered by Justice Francis,
Justices Lang and Evans participating.

    Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.


Judgment entered July 3, 2013


        /Molly Francis/
        MOLLY FRANCIS
        JUSTICE



# Court of Appeals
# Fifth District of Texas at Dallas

## JUDGMENT

ANTHONY EUGENE JOHNSON,
Appellant

No. 05-12-00744-CR     V.

THE STATE OF TEXAS, Appellee

On Appeal from the 292nd Judicial District
Court, Dallas County, Texas
Trial Court Cause No. F11-00273-V.
Opinion delivered by Justice Francis,
Justices Lang and Evans participating.

Based on the Court's opinion of this date, the judgment of the trial court is **AFFIRMED**.

Judgment entered July 3, 2013

/Molly Francis/
MOLLY FRANCIS
JUSTICE