**Opinion filed May 30, 2014**



In The

# Eleventh Court of Appeals

_____

## No. 11-12-00114-CR

_____

## STEPHEN CRAIG WHITWORTH, Appellant

## V.

## THE STATE OF TEXAS, Appellee

**On Appeal from the 441st District Court**

**Midland County, Texas**

**Trial Court Cause No. CR38839**

## M E M O R A N D U M   O P I N I O N

The jury convicted Stephen Craig Whitworth of murder and aggravated assault with a deadly weapon. *See* TEX. PENAL CODE ANN. §§ 7.01 (parties to offenses), 7.02 (criminal responsibility for conduct of another), 19.02(b)(1), (2) (murder), 22.02(a) (aggravated assault) (West 2011). The jury assessed his punishment at confinement for twenty years on each count. The trial court

sentenced him accordingly and ordered his sentences to run concurrently. Appellant raises four issues on appeal. Because we find that the trial court erred when it failed to instruct the jury on the defense of duress as to the aggravated assault charge, we reverse and remand with respect to Appellant's conviction for aggravated assault with a deadly weapon. We affirm Appellant's conviction for murder.

The evidence at trial showed that Appellant and Paul Lee picked up Anne Bostic and Chris Easley at approximately 4:00 a.m. on June 6 to go smoke marihuana. Lee drove the four of them to a shut-down pump jack in Midland. Bostic testified that, after the four of them finished smoking a marihuana blunt, Lee called Easley to the trunk of the car and said he wanted to show Easley something. Easley walked to the rear of the car. Bostic was sitting sideways in the rear seat on the driver's side with her feet hanging out of the car when she heard the trunk slam and someone get hit. She stood up and saw Easley's legs on the ground. Lee was kneeling over the top of Easley and hitting him multiple times. Lee stopped, and Bostic could hear Easley gargling and wheezing. Lee went back to Easley, and Bostic could hear air escaping from Easley's lungs, like he had been stabbed.

Easley suffered four crushing blows to his face and four stab wounds to his chest. His heart was perforated by two of the stab wounds, and bone fragments penetrated his brain due to the crushing blows to his forehead; he died as a result of the injuries. There was no dispute that Lee killed Easley.

Bostic testified that, as Lee was attacking Easley, Appellant held her and forced her to watch the murder. She said that Appellant told her that she needed to watch and that Easley needed to be taught a lesson. Appellant took her to the front of the car, and she asked him if they were going to hurt her. He told her that they were not going to hurt her but that they were going to have to take her somewhere

and that she could not talk to anyone for six months. Bostic testified that Appellant left her at the front of the car and went and talked to Lee. When she started walking away, Appellant came up behind her, started choking her, and popped her neck. Bostic let her body go limp, and she fell to the ground and "played dead." Appellant dragged her over to a bush at the place where he had already dragged Easley. Bostic heard him say, "She's dead. It's okay. She's dead." Bostic then heard footsteps coming toward her. Someone lifted her head by her hair and cut her throat. She felt blood pouring out of her throat and felt a hand on her back. Bostic testified that she passed out, woke up next to Easley, and heard Lee and Appellant getting in Lee's car and leaving. She waited until the sun came up and started walking down the road.

Bostic was able to get back to the main road where a man saw her running and waving her hands as if she was in need of help. The man stopped to help her, called 911, and gave her water and a shirt that she could use to stop the bleeding from her neck. Bostic was treated at Midland Memorial Hospital. She required immediate surgical intervention in order to survive. She had suffered major trauma to her neck; her internal jugular veins had been cut. Bostic also suffered multiple stab wounds to her torso.

Appellant testified that he, Lee, Bostic, and Easley were standing around the trunk of the car smoking marihuana when Lee, out of nowhere, attacked Easley with a set of bolt cutters that Lee had gotten from the trunk of the vehicle. Appellant testified that he did not try to stop Lee when Lee was hitting Easley because he knew that Lee could overpower him and that Lee had a weapon; he was afraid of Lee. He grabbed Bostic by her hand and walked her to the front of the car. Appellant made her sit on the car and face him. He told her not to watch and to stay calm. Both he and Bostic were "freaking out." Appellant saw Lee hit Easley over and over again with the bolt cutters and saw Lee stab Easley in the

neck and in the chest. He did not want to run because Lee had the keys to the car and because he was afraid Lee would chase him down in the car. He also did not want to leave Bostic and did not think she would be able to run because Easley had had to help her to the car when Lee and Appellant picked them up to go smoke marihuana.

After Lee had killed Easley, he walked over to Appellant and told him that he needed to get rid of Easley's body. Appellant, according to his testimony, just stood there. Lee gave Appellant "a look" and again told him to get rid of the body. Appellant walked to the back of the vehicle and was horrified and shocked by what he saw. He was scared of what Lee could do to him and Bostic after he saw what Lee had done to Easley. Lee told him again to get rid of the body, and because Appellant did not want Lee to kill him, Appellant dragged Easley to a nearby bush. Appellant went back to check on Bostic.

Lee asked to see Appellant's cell phone, and he typed a message on Appellant's phone that said it was Appellant's turn to finish Bostic and, if he did not finish her, he would be next. Appellant testified that he believed that meant, if he did not kill Bostic, Lee would kill him. Appellant took Bostic fifty feet away from the vehicle and pretended to break her neck by putting her in a choke hold and cracking his knuckles loudly. He testified that he was trying to make her pass out. Her body went limp, and he put her on the ground. He told Lee that she was dead. Lee said, "She's still breathing. You've got to stab her." Appellant told Lee that he could not do that and tried to convince Lee that he had broken her neck and that she was already dead. Lee told Appellant to give him his knife. Appellant testified that he was scared and that Lee had this look on his face like he was going to do something to Appellant if he did not comply. Appellant gave Lee his knife, and Lee stabbed Bostic four times in the back. Lee then told Appellant to help move her body next to Easley's body. The two moved her body and started

4

walking away. Lee began to have second thoughts about Bostic being alive. Appellant again tried to convince him that she was dead and that he should just leave her alone. Lee walked back to her body and stabbed her in the neck.

Lee and Appellant went back to the Travelodge where they were living at the time, and Lee ordered him to take a shower. Appellant testified that he started taking sleeping pills in an effort to overdose because he did not want to live after what he had seen. He then decided that he still needed to tell the police what had happened, so he stopped taking the pills. After they had showered and picked up their roommate from work, Lee told Appellant that Appellant had to go with him to get rid of the clothes that they had been wearing. They drove to a dirt road and set the clothes on fire. Appellant and Lee then returned to the Travelodge and went to sleep. Appellant testified that he could not leave because Lee was watching him and never let him out of his sight. He tried to stay awake until Lee fell asleep, but the sleeping pills made him fall asleep first. Appellant was later awakened by Midland County Sheriff's officers, and they apprehended him and Lee.

In his first issue, Appellant argues that the evidence was insufficient to support his conviction as the principal actor for the murder of Easley and the aggravated assault with a deadly weapon of Bostic. He specifically argues that the State failed to prove that Appellant himself, as the principal actor, personally committed either of the charged felonies. Appellant asserts that the State relied on the law of parties to convict Appellant; however, Appellant does not challenge the sufficiency of the evidence to support his convictions of murder and aggravated assault with a deadly weapon based upon the law of parties. The jury was instructed under both principal and party theories as to each charge and returned a general verdict of guilty on each. Even if we were to agree that the evidence was insufficient to support the convictions of Appellant as a principal actor, he has failed to challenge the sufficiency of the evidence under the law of parties and has

5

repeatedly stated in his brief that the jury could have convicted him only on the basis of the law of parties. Therefore, we overrule Appellant's first issue.

Appellant asserts in his third and fourth issues that the trial court erred when it denied his request for a jury instruction on the defense of duress and the defense of necessity. When the evidence at trial raises a defensive issue, and the defendant properly requests a jury instruction on that issue, the trial court must submit the issue to the jury. *Booth v. State*, 679 S.W.2d 498, 500 (Tex. Crim. App. 1984). "[A] defense is supported (or raised) by the evidence if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007). When determining whether the evidence raises a defense, the credibility of the evidence is not at issue; the evidence may be strong, weak, contradicted, unimpeached, or unbelievable. *Muniz v. State*, 851 S.W.2d 238, 254 (Tex. Crim. App. 1993).

The doctrine of confession and avoidance applies to the defense of duress and the defense of necessity. *Juarez v. State*, 308 S.W.3d 398, 399 (Tex. Crim. App. 2010) (necessity); *Gomez v. State*, 380 S.W.3d 830, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (duress). Thus, to be entitled to an instruction on the defense of duress, Appellant must point to defensive evidence that shows that he admits to every element of the offense, including the culpable mental state. *Shaw*, 243 S.W.3d at 659.

The State argues that Appellant did not admit to the charged conduct: murder and aggravated assault with a deadly weapon. Although the State is correct in this assertion as far as Appellant's involvement as a principal is concerned, Appellant did admit to conduct that could implicate him as a party to the offense of aggravated assault with a deadly weapon. A person can be held criminally responsible as a party to an offense, even when the person does not

6

commit the actual offense, if the person is criminally responsible for the act of another. *See* TEX. PENAL CODE ANN. § 7.01 (West 2011). A person is criminally responsible for an offense committed by the conduct of another if, with the intent to promote or assist the commission of the offense, the person solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. *Id.* § 7.02(a)(2).

The State argues that Appellant denied assisting in the offense as a party because, when specifically asked whether he solicited, encouraged, directed, aided, or attempted to aid Lee in murdering Easley or in assaulting Bostic, he responded that he did not. However, Appellant testified that, when Lee told him to stab Bostic and he responded that he could not do that, Lee demanded Appellant's knife. Appellant handed Lee his knife, and Lee stabbed Bostic. In addition, in his statement to police, Appellant said that he told Lee that Bostic was still breathing and that he told Lee to "finish her." Thus, although Appellant never admitted to actually stabbing Bostic or to committing the specific acts as listed in the statute, he did admit to conduct that showed that he aided and encouraged Lee to commit the offense of aggravated assault with a deadly weapon.

We do not believe, however, that Appellant admitted to conduct that would implicate him as a party to the offense of murder. The only act in relation to the murder of Easley that Appellant admitted to was that he dragged Easley's body to a bush after Lee told him multiple times to do so. This conduct occurred after Lee had already committed the offense of murder. Acts done after the offense is completed do not make the accused a party to the offense. *Gross v. State*, 380 S.W.3d 181, 185–88 (Tex. Crim. App. 2012); *Morrison v. State*, 608 S.W.2d 233, 235 (Tex. Crim. App. 1980). Thus, Appellant did not admit to conduct that made him liable as a party to the offense of murder. The trial court did not err when it denied Appellant's request for an instruction on the defenses of duress and

necessity as to the charge of murder. We overrule Appellant's third and fourth issues as to the murder charge.

As to the aggravated assault charge, we must now look to whether the evidence supports an instruction on the defense of duress. The affirmative defense of duress requires the actor to have engaged in the conduct because he was compelled to do so by threat of imminent death or serious bodily injury to himself or another. PENAL § 8.05(a). Compulsion "exists only if the force or threat of force would render a person of reasonable firmness incapable of resisting the pressure." *Id.* § 8.05(c). The affirmative defense of duress is not available if the actor "intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." *Id.* § 8.05(d).

Appellant testified that Lee typed a message on Appellant's phone that said that it was Appellant's turn to finish Bostic and that, if he did not finish her, he would be next. Appellant believed that Lee meant that, if Appellant did not kill Bostic, Lee would kill him. Appellant then pretended to kill her and told Lee that she was dead. When Lee told Appellant that she was still breathing and that Appellant needed to stab her, Appellant told Lee that he could not do that and tried to convince Lee that she was already dead. Lee called Appellant a "pussy" and told Appellant to give him his "f-----g" knife. Appellant testified that he was scared and that Lee had this look on his face like he was going to do something to Appellant if he did not comply. Appellant gave Lee his knife, and Lee stabbed Bostic.

Appellant also testified that Lee had become more aggressive since he started selling marihuana. Lee was bigger and taller than Appellant and had overpowered him in several physical altercations. Appellant also testified that Lee had connections with prison and street gangs and that he feared what Lee could do to him if he told the police what had happened. He explained that the reason he

8

finally told police about what had happened was because he was moved to "segregation" in jail and realized that Lee could not get to him there.

After reviewing the relevant evidence, we find that the evidence does support an instruction on the defense of duress. Appellant testified that he pretended to kill Bostic because he was afraid Lee was going to kill him if he did not kill her and that he gave Lee his knife to stab Bostic because he was afraid of what Lee would do to him. In addition, Appellant's testimony indicates that the incident with Bostic occurred after Appellant watched Lee kill Easley and after he was forced to drag Easley's body to a bush—an act that he also testified he committed because he was in fear for his and Bostic's lives. Thus, Appellant presented some evidence, regardless of how strong, weak, contradicted, unimpeached or unbelievable, to show that he engaged in conduct to aid and encourage Lee to commit the offense of aggravated assault against Bostic because he was compelled to do so by threat of imminent death or serious bodily injury. *See Muniz*, 851 S.W.2d at 254.

The State argues that, even if the defense was raised in this case, Appellant was not entitled to an instruction because he placed himself in a situation in which it was probable for him to be subjected to compulsion. We disagree. The State directs us to *Guia v. State*, 220 S.W.3d 197 (Tex. App.—Dallas 2007, pet. ref'd), and *Guffey v. State*, No. 11-10-00106-CR, 2012 WL 1470185 (Tex. App.—Eastland April 26, 2012, pet. ref'd) (mem. op., not designated for publication), to support its argument. Each of these cases is distinguishable from the circumstances of this case.

In *Guia*, the Dallas Court of Appeals was asked to review the sufficiency of the evidence to support the jury's rejection of the defendant's duress defense. *Guia*, 220 S.W.3d at 205. The court stated that it would "find the evidence factually sufficient to support the rejection of a claim of duress where the evidence

shows that the defendant intentionally, knowingly, or recklessly placed himself in a situation in which it was probable that he would be subjected to compulsion." *Id.* After reviewing the evidence, the court held that it could not conclude that the overwhelming weight of the evidence supported the defendant's claim of duress. *Id.* The court in *Guia* did not hold that the defendant was not entitled to an instruction on duress but, rather, that the evidence was sufficient to support the jury's rejection of the defense. *Id.* The question before us is not one of sufficiency of the evidence, but one addressed at entitlement to a jury issue. Furthermore, the defendant in that case claimed that he sold drugs to an undercover police officer only after the officer confronted him, armed with three guns. *Id.* However, the evidence showed that the officer gave the defendant money to buy drugs and that the defendant then took off. *Id.* at 200. The officer later found the defendant at his home and demanded that the defendant give him the drugs. *Id.* The officer had already purchased drugs from the defendant at an earlier date. *Id.* at 200. The circumstances in *Guia* are very different from the facts of this case; *Guia* does not support the State's argument that Appellant was not entitled to an instruction on the defense of duress.

In *Guffey*, we held that the defendant was not entitled to an instruction because the evidence showed that he was a member of the Aryan Brotherhood and that a higher ranking member commanded him to kidnap a woman that had just ended a romantic relationship with the higher ranking gang member. *Guffey*, 2012 WL 1470185, at *1, 3. We explained that the defendant, through his membership in the Aryan Brotherhood, placed himself in a situation in which he would be obligated to carry out orders from higher ranking members and, thus, placed himself in a situation in which he would be subjected to compulsion. *Id.* at *3–4.

Here, the State contends that Appellant also placed himself in a situation in which he would be subjected to compulsion because Appellant continued to live

10

with and associate with a person that he believed had connections with organized crime, a person that had expressed a general desire to murder and rape someone, a person that had dealt and consumed drugs, and a person that was bigger than Appellant and could overpower him. These circumstances are very different from the circumstances in *Guffey* in which the defendant was a member of a gang and, through that membership, knew that he would have to take orders from higher ranking members. The evidence here did not show that Lee had ever threatened Appellant to act in a certain way or that Appellant was afraid that Lee would use his prison gang connections against him prior to the murder and aggravated assault. Furthermore, we do not believe that Appellant's testimony, that Lee had recently made the comment that Lee wanted to murder and rape someone, shows that Appellant placed himself in a situation in which he would be forced to commit such a heinous crime. Therefore, because we find that Appellant admitted to conduct that made him responsible as a party to the aggravated assault, that Appellant testified that he was in fear for his life when he committed such conduct, and that the evidence does not show that he placed himself in a situation in which he would be subject to compulsion, we hold that the trial court erred when it denied Appellant's request for an instruction on the defense of duress.

Having found that the trial court erred, we must now determine whether the error was harmful. A properly preserved error in the jury charge requires reversal if the error was calculated to injure the rights of the defendant, meaning that reversal is required if the accused suffered some harm from the error. TEX. CODE CRIM. PROC. ANN. art. 36.19 (West 2006); *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985). The actual degree of harm caused by the error must be determined in light of the entire jury charge; the state of the evidence, including the contested issues and the weight of the probative evidence; the argument of counsel;

and any other relevant information revealed by the record. *Almanza*, 686 S.W.2d at 171.

Here, Appellant properly preserved error when he requested the defensive instruction and when he objected to the trial court's exclusion of the instruction from the jury charge. Thus, if we find that Appellant suffered some harm from the trial court's decision to exclude the defensive instruction as to the aggravated assault charge, then we must reverse that conviction. Appellant's theory was that he was forced to participate in the aggravated assault because Lee threatened to kill him if he did not. Appellant testified that he had no idea that either of the crimes was going to take place and that he thought they were just going to smoke some marihuana and then were going to go to the motel and go to sleep. Because Appellant's defense in the aggravated assault case was based upon duress, we cannot say that he did not suffer some harm from the trial court's error. We sustain Appellant's third issue as to his conviction for aggravated assault with a deadly weapon.

Because we have found that the trial court erred when it failed to instruct the jury on the defense of duress, it is not necessary for us to address Appellant's fourth issue, as to the aggravated assault charge, in which Appellant contends that the trial court also erred when it failed to instruct the jury on the defense of necessity. *See* TEX. R. APP. P. 47.1. It is also not necessary for us to address Appellant's second issue as to whether the trial court erred when it excluded expert testimony regarding Appellant's susceptibility to duress. *See id.*

We affirm the judgment of the trial court as to Appellant's conviction and punishment for murder. We reverse the judgment of the trial court as to Appellant's conviction for aggravated assault with a deadly weapon, and we remand the cause to the trial court for further proceedings on that charge.


JIM R. WRIGHT

CHIEF JUSTICE


May 30, 2014

Do not publish. *See* TEX. R. APP. P. 47.2(b).

Panel consists of: Wright, C.J.,
Willson, J., and Bailey, J.