# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

## NO. 03-17-00542-CR

**Cynthia Ann Holowatsch, Appellant**

**v.**

**The State of Texas, Appellee**

### FROM THE DISTRICT COURT OF BELL COUNTY, 426TH JUDICIAL DISTRICT
### NO. 76978, HONORABLE FANCY H. JEZEK, JUDGE PRESIDING

## M E M O R A N D U M   O P I N I O N

A jury found appellant Cynthia Ann Holowatsch guilty of murder, *see* Tex. Penal Code § 19.02, and assessed punishment at confinement for forty-five years in the Institutional Division of the Texas Department of Criminal Justice, *see id.* §§ 12.32 (setting punishment range for first degree felonies), 19.02(c) (stating that offense generally is felony of first degree). In one point of error, appellant contends that she presented evidence that "she believed force was necessary to protect another from immediate harm," and, therefore, that the trial court erred by not instructing the jury on the defense of a third person. *See id.* § 9.33 (describing circumstances when "person is justified in using force or deadly force against another to protect a third person"). For the following reasons, we affirm the judgment of conviction.

## Background[1]

Appellant was indicted for "intentionally and knowingly cause[ing] the death of an individual, namely, Roy Linder III, by shooting him with a deadly weapon to-wit: a firearm" on or about January 13, 2017. It was undisputed at trial that, on that day, appellant shot Linder with a handgun, causing Linder's death. At the time of the incident, appellant was in the process of moving her possessions out of a home in which she had been renting one of the bedrooms. She had not been staying in the home for the preceding few weeks, and there was tension between her and other persons living in the home. The home was owned by Laura Rachel Wilbanks; Wilbanks was Linder's girlfriend; Linder and Wilbanks shared the same bedroom; and Wilbanks's daughter and Noah Godsil also lived at the home.

To assist her with the move on that day, appellant brought four men with her to the home. Just prior to the shooting, appellant was in her bedroom with one of the movers, Christopher Bradberry, and Linder and another one of the movers, Rahjer Chambers, were having a "heated discussion" with raised voices in the home's living room. Linder, unarmed and shirtless, had just woken up. He came out of his bedroom into the living room and began exchanging words with Chambers and moving toward him. Linder was upset that men he did not know and did not expect were in the home and that Chambers was speaking with Linder's baby who was being held by Wilbanks at the time. Linder used an ethnic slur about Chambers. When Linder and Chambers

---

[1] Because the parties are familiar with the facts of the case, its procedural history, and the evidence adduced at trial, we provide only a general overview of the facts of the case here. We provide additional facts in the opinion as necessary to advise the parties of the Court's decision and the basic reasons for it. *See* Tex. R. App. P. 47.1, 47.4. The facts recited are taken from the testimony and exhibits admitted at trial.

were about four feet apart, appellant came into the living room from her bedroom and, in a "continuous motion," pushed Chambers aside and shot Linder in the neck. Although Wilbanks performed CPR and attempted other efforts to save Linder, he died at the scene within minutes of being shot. Witnesses to the shooting were Wilbanks, who was holding Linder's baby and sitting on a couch in the living room; Godsil, who was also in the living room; and Bradberry, who had followed appellant out of the bedroom into the living room.

The jury trial occurred from July 31, 2017, to August 3, 2017. During the guilt-innocence portion of the trial, the State's witnesses included the eyewitnesses Wilbanks, Godsil, Chambers, and Bradberry; a responding sergeant with the police department who arrived at the home shortly after the shooting; an officer who had been on "civil standby" at the home at appellant's request shortly before the incident; and the medical examiner who performed the autopsy. The evidence was undisputed that appellant was in her bedroom with Bradberry when Linder and Chambers began exchanging words; that Linder said the "N word" about Chambers; that Linder was unarmed and did not use force against Chambers; and that Linder was several feet away from Chambers when appellant came into the living room from her bedroom and shot Linder in the neck.

The eyewitnesses Wilbanks, Godsil, Chambers, and Bradberry generally testified consistently about what happened. Wilbanks testified that Linder and Chambers were about ten feet apart when they began exchanging words, that Linder pointed his index finger at Chambers but that Linder did not have anything in his hands or use force against Chambers, and that Linder and Chambers were about four or five feet apart when appellant "pushed the black guy, and then shot [Linder]." Wilbanks testified that appellant "come in and shoved [Chambers] out of the way and

3

then just said—or she said get back [to Chambers], and then took a step forward and pulled the trigger." Wilbanks also testified that: (i) she told appellant when appellant arrived at the home that Linder was there and asleep; (ii) Linder did not exhibit a weapon at any time; (iii) appellant was in the living room for "[l]ike two seconds" before she fired the shot; and (iv) appellant did not ask any questions before pulling the trigger. Godsil similarly testified that Linder and Chambers were having a "heated discussion" but that he did not see Linder swing his arms or hands and that appellant "almost barreled into" Chambers and said "get back and less than five seconds, like, shot [Linder]" without giving anyone time to move before pulling the trigger.

Chambers testified about his verbal exchange with Linder prior to the shooting—that he could tell Linder had just woken up when Linder walked into the living room, that Linder was "ranting and raving," that Linder called him a "nigger," that Linder was "coming at [him]," and that he was preparing for a physical fight with Linder, but that Linder never got close enough and that Chambers did not fear for his safety. Chambers testified that he had been in the army, that he was capable of defending himself, and that "[w]e all know that" the gun was not necessary to intervene and that it was "excessive." He also described how close Linder was to him when appellant "push[ed] him out of the way," and told him, "I got this one," as she was raising the gun, and Chambers testified that the gun went off in "[s]econds." Bradberry, who was in appellant's bedroom with her when he heard "some argument, loud voice," described how appellant "got in front" of Chambers, "and next thing [he knew], she just pull[s] out a gun and shoots [Linder]." He testified that Chambers and Linder were about four feet apart at that time and that he did not perceive danger for Chambers—that "[i]f anything was going to happen, it was just going to be a fist fight."

4

The officer, who was at the home for "civil standby" shortly before the shooting, testified that things were "nice and calm" when he arrived but that he told appellant that he could only stay twenty minutes and that appellant responded, "Well, after you leave, whatever happens, happens. History is history." The evidence showed that appellant shot Linder within a short time after the officer left and that appellant had not told the officer—or anyone else—that she was carrying a loaded handgun in her pocket. According to the medical examiner, the gun was within one to three feet of Linder when appellant shot him in the neck. The State's exhibits included photographs of the victim, a hand-drawn diagram of the living room with locations marked for persons in the room, recorded 911 calls from appellant requesting the civil standby and seeking assistance shortly after shooting Linder, and recorded 911 calls from Godsil and Chambers shortly after the shooting.

The defense theory at trial was that appellant was justified in shooting Linder because she was "protecting" Chambers. Appellant testified on her own behalf, and she relied on evidence that Linder was under the influence of drugs and alcohol at the time of his death and that he was physically larger than Chambers. Appellant testified that she was responsible for Chambers because he was at the home to help her move and that she pulled the trigger to protect a friend. She testified: (i) she contacted the police for civil standby because she was "scared" of Linder and afraid of "physically being hurt"; (ii) that she found him to be "[v]iolent and abusive"; (iii) she was afraid for Chambers; (iv) she "believed [Linder] was going to hurt" Chambers—that he "may even kill him"; (v) Linder was "coming at [them]," with his hands "balled up like a fist" and chest "puffed up"; (vi) Linder had a "raging look" and was "within striking distance"; and (vii) Linder had previously

5

told her that he was an "MMA fighter" and that his "hands were registered with the police department."[2] Appellant also testified about prior incidents between the roommates in which she had called the police, including an incident in which the power was cut off to her bedroom.

Appellant, however, did not contend that Linder was armed with anything other than his hands when she shot him or that he had any physical contact with Chambers. She also admitted that she "pushed [Chambers] back" before shooting Linder; that she told Wilbanks after she shot Linder that Linder "got what he deserved"; that she had never seen Linder in a physical fight or assault another person, although she testified that she had seen him punch a dog; and that she did not tell anyone, including the standby officer, that she had a loaded handgun in her pocket on the day of the incident.

The jury found appellant guilty of murder as charged in the indictment. After hearing additional evidence in the punishment phase of the trial, the jury assessed punishment at confinement of forty-five years in the Institutional Division of the Texas Department of Criminal Justice. The trial court thereafter rendered judgment in accordance with the jury's verdict. This appeal followed.

**Analysis**

In her sole point of error, appellant seeks to have her judgment of conviction reversed and the case remanded to the trial court for a new trial on the ground that there was error in the jury charge. Appellant contends that the trial court erred by refusing her request to instruct the jury on

---

[2] According to appellant, MMA refers to "mixed martial arts, a full combat contact sport." Appellant also testified that Linder previously told her that "his hands were registered legal weapons."

the defense of a third person and that she was harmed by the trial court's refusal to include the instruction.

**Standard of Review and Applicable Law**

We review alleged jury charge error in two steps: first, we determine whether error exists; if so, we then evaluate whether sufficient harm resulted from the error to require reversal. *Arteaga v. State*, 521 S.W.3d 329, 333 (Tex. Crim. App. 2017); *Ngo v. State*, 175 S.W.3d 738, 743-44 (Tex. Crim. App. 2005). The degree of harm required for reversal depends on whether the jury charge error was preserved in the trial court. *Marshall v. State*, 479 S.W.3d 840, 843 (Tex. Crim. App. 2016); *see* Tex. Code Crim. Proc. art. 36.19; *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g) (setting forth procedure for appellate review of claim of jury charge error).

A trial court is statutorily obligated to instruct the jury on the "law applicable to the case." Tex. Code Crim. Proc. art. 36.14; *Arteaga*, 521 S.W.3d at 334. "The issue of the existence of a defense is not submitted to the jury unless evidence is admitted supporting the defense." Tex. Penal Code § 2.03(c); *Zuliani v. State*, 97 S.W.3d 589, 594 (Tex. Crim. App. 2003) (placing burden on defendant of producing "some evidence" to support defense). A defense is raised by the evidence "if there is some evidence, from any source, on each element of the defense that, if believed by the jury, would support a rational inference that that element is true." *Shaw v. State*, 243 S.W.3d 647, 657–58 (Tex. Crim. App. 2007); *see, e.g.*, *Gamino v. State*, 537 S.W.3d 507, 510 (Tex. Crim. App. 2017) (stating that "trial court errs in denying a self defense instruction if there is some evidence, from any source, when viewed in the light most favorable to the defendant, that will support the

7

elements of self defense"). "In determining whether a defense is thus supported, a court must rely on its own judgment, formed in the light of its own common sense and experience, as to the limits of rational inference from the facts proven." *Shaw*, 243 S.W.3d at 658. However, "a judge must give a requested instruction on every defensive issue raised by the evidence without regard to its source or strength, even if the evidence is contradicted or is not credible." *Krajcovic v. State*, 393 S.W.3d 282, 286 (Tex. Crim. App. 2013) (citing *Juarez v. State*, 308 S.W.3d 398, 404–05 (Tex. Crim. App. 2010)).

As alleged in the indictment, a person commits murder if he intentionally or knowingly causes the death of an individual. *See* Tex. Penal Code § 19.02(b)(1). A person, however, may be justified in using deadly force against another to defend a third person. *See id.* § 9.33. Section 9.33 of the Penal Code sets forth the elements of the defense of a third person:

> A person is justified in using force or deadly force against another to protect a third person if:
>
> (1)    under the circumstances as the actor reasonably believes them to be, the actor would be justified under Section 9.31 or 9.32 in using force or deadly force to protect himself against the unlawful force or unlawful deadly force he reasonably believes to be threatening the third person he seeks to protect; and
>
> (2)    the actor reasonably believes that his intervention is immediately necessary to protect the third person.

*Id.* § 9.33. Section 9.31 sets forth the elements of self-defense, *id.* § 9.31, and, in relevant part, section 9.32 addresses when a person is justified in using deadly force in the defense of a person:

> A person is justified in using deadly force against another:

(1)     if the actor would be justified in using force against the other under Section 9.31; and

(2)     when and to the degree the actor reasonably believes the deadly force is immediately necessary:

(A)     to protect the actor against the other's use or attempted use of unlawful deadly force . . . .

*Id.* § 9.32(a). "'Deadly force' means force that is intended or known by the actor to cause, or in the manner of its use or intended use is capable of causing, death or serious bodily injury." *Id.* § 9.01(3); *see id.* § 1.07(a)(46) (defining "serious bodily injury"); *Ferrel v. State*, 55 S.W.3d 586, 591–92 (Tex. Crim. App. 2001) (comparing when person acting in self-defense is entitled to use deadly force or non-deadly force). "[I]n the context of self-defense and defense of a third person, force that is 'immediately necessary' to protect oneself or another from a person's use of unlawful force is force that is needed at that moment—'when a split second decision is required.'" *Henley v. State*, 493 S.W.3d 77, 89–90 (Tex. Crim. App. 2016).

"The focus of the defense-of-third-persons defense is upon what the actor reasonably believes concerning the situation of the third person." *Morales v. State*, 357 S.W.3d 1, 8 (Tex. Crim. App. 2011); *see Smith v. State*, 355 S.W.3d 138, 145 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (explaining that "person defending on the grounds of defense of a third person stands in the shoes of the third person" and that "use of force to protect a third person is justified in any situation in which the third person would be justified in using force to protect himself" (citing *Hughes v. State*, 719 S.W.2d 560, 564 (Tex. Crim. App. 1986))); *Singleton v. State*, No. 03-01-00057-CR, 2002 Tex. App. LEXIS 1875, at *14 (Tex. App.—Austin Mar. 14, 2002, no pet.) (mem. op., not

9

designated for publication) (explaining that there was "objective, temporal component to section 9.33" and that "objective circumstances must indicate that the defendant's subjective belief was reasonable before a defensive instruction under section 9.33 is required"). "'Reasonable belief' means a belief that would be held by an ordinary and prudent man in the same circumstances as the actor." Tex. Penal Code § 1.07(a)(42).

**Did the trial court err in refusing to instruct the jury on the defense of a third person?**

Appellant contends that the trial court erred by not instructing the jury on the defense of a third person because she presented evidence that she believed deadly force was necessary to protect Chambers from harm. Appellant focuses on her own testimony to support her position that she reasonably believed deadly force against Linder was necessary to protect Chambers. She cites her testimony that: (i) she requested the officer's presence for civil standby; (ii) she was afraid of "physically being hurt" by Linder; (iii) in one of the previous incidents involving the roommates in which the police were called, she asked the responding officer about her self-defense rights; (iv) at the time of the incident, Linder had his hands "balled up like a fist," his chest "puffed up," was "within striking distance," and was in a rage; (v) she "believe[d] [Linder] may even kill [Chambers]"; (vi) she put herself between Linder and Chambers to protect Chambers; and (vii) she believed that Linder was an "MMA fighter" and that his "hands were registered legal weapons" because that was what Linder previously had told her. She also cites testimony from Chambers that Linder was "ranting and raving" and using ethnic slurs.

By definition, appellant used deadly force when she shot Linder. *See* Tex. Penal Code § 9.01(3) (defining "deadly force"); *Ferrel*, 55 S.W.3d at 591–92 (explaining that defendant "by

10

definition used deadly force" based on court's finding that "actual blow of the [beer] bottle indisputably caused serious bodily injury to [victim]"); *see also* Tex. Penal Code § 1.07(a)(17) (defining "deadly weapon" to include firearm). Thus, to be entitled to a jury instruction on the defense of a third person, appellant was required to present some evidence that would support a rational inference that an "ordinary and prudent man in the same circumstances" as appellant would have believed that Linder was threatening "unlawful deadly force" against Chambers and that appellant's "intervention"—the use of deadly force against Linder—was "immediately necessary to protect" Chambers. *See* Tex. Penal Code §§ 1.07(a)(42), 9.32, 9.33; *Shaw*, 243 S.W.3d at 657–58; *see also O'Neal v. State*, No. 01-12-00638-CR, 2013 Tex. App. LEXIS 13329, at *5 (Tex. App.—Houston [1st Dist.] Oct. 29, 2013, no pet.) (mem. op., not designated for publication) (explaining that trial court is required "to instruct the jury on a defense only if there is some evidence on each element of the defense to support a rational inference that the element is true").

The evidence, however, was undisputed that Linder was unarmed; that he had not attempted to punch or hit Chambers with his hands or any other object; that he had not verbally threatened Chambers with the use of deadly force; that Linder and Chambers remained several feet apart when appellant entered the living room, pushed Chambers aside, and shot Linder; and that, at most, Linder and Chambers may have had a fistfight if appellant had not intervened. *See Sanchez v. State*, 418 S.W.3d 302, 310 (Tex. App.—Fort Worth 2013, pet. ref'd) (collecting cases concluding that punch or attempted punch was not deadly force); *see also* Tex. Penal Code § 9.31(b)(1) ("The use of force against another is not justified . . . in response to verbal provocation alone."); *cf. Kipp v. State*, No. 03-09-00175-CR, 2009 Tex. App. LEXIS 7884, at *10–11 (Tex. App.—Austin

Oct. 9, 2009, no pet.) (mem. op., not designated for publication) (explaining that use of fist or pipe was, by definition, deadly force in situation where use of fist or pipe actually caused serious bodily injury). As Chambers testified, "we all know that" the gun was unnecessary and excessive.

Given the evidence concerning the situation in the living room and the circumstances under which appellant walked into the living room and shot Linder, appellant's testimony concerning her subjective beliefs about Linder, such as his hands being "legal weapons," does not support a rational inference that an "ordinary and prudent man in the same circumstances" as appellant would have believed that Linder was threatening "unlawful deadly force" against Chambers or that the use of deadly force was "immediately necessary to protect" Chambers. *See* Tex. Penal Code § 9.33; *Morales*, 357 S.W.3d at 8 (explaining that focus is upon actor's reasonable belief "concerning the situation of the third person"); *Shaw*, 243 S.W.3d at 658 (allowing court to rely on "common sense and experience"); *Sanchez*, 418 S.W.3d at 310 (concluding that defendant was not entitled to instruction on self-defense or defense of third persons and that "nothing in the record reveals any basis for [defendant] to reasonably believe that he needed to use deadly force against [the victim]"); *O'Neal*, 2013 Tex. App. LEXIS 13329, at *6–7 (concluding that "nothing in the record supports a rational inference that an ordinary and prudent person in [defendant]'s situation would have believed that [third party] was threatened by [victim] such that deadly force was justified and immediately necessary to protect [third party]"); *see also Williams v. State*, No. 11-12-00261-CR, 2014 Tex. App. LEXIS 10756, at *4 (Tex. App.—Eastland Sept. 25, 2014, no pet.) (mem. op., not designated for publication) (concluding that there were no facts in record, that if believed, would raise issue of self-defense in response to deadly force and explaining that "unless there is evidence

12

that would support a belief that [the victim] used or attempted to use deadly force, [defendant] was not entitled to a jury instruction on self-defense"); *Singleton*, 2002 Tex. App. LEXIS 1875, at *14 (explaining that "objective circumstances must indicate that the defendant's subjective belief was reasonable before a defensive instruction under section 9.33 is required" and that "defendant's testimony that she subjectively believed her actions were necessary to protect the third person is not sufficient").

As support for her position that the trial court erred, appellant cites the Texas Court of Criminal Appeal's opinion in *Gamino v. State*. We do not find the facts of that case analogous to the facts before this Court or our analysis inconsistent with the court's analysis in that case. In *Gamino*, the Texas Court of Criminal Appeals concluded that the trial court should have instructed the jury on self-defense because the defendant's testimony was some evidence that he "reasonably believed his use of force was immediately necessary to protect himself and his girlfriend against [the victim]'s use or attempted use of unlawful force." 537 S.W.3d at 512–13. The appeal was from the defendant's conviction of aggravated assault with a deadly weapon, and the evidence at the trial was that the defendant pointed a gun at the victim after uttering, "I got something for you." *Id.* at 508–09. In explaining the circumstances surrounding his actions, the defendant testified that the victim had threatened him and his girlfriend, that he drew his weapon when the victim approached him in an "aggressive manner," and that he "held it by [his] side" and said, "Get back, leave us alone." *Id.* at 512. Based on the defendant's testimony, the court concluded that there was some evidence that he "produced his gun for the limited purpose of creating an apprehension that he would use deadly force if necessary" and, therefore, that the defendant's display of the gun was non-deadly

13

force, entitling him to a self-defense instruction under section 9.31 of the Penal Code. *Id.* at 510–12 (citing Tex. Penal Code § 9.04 (explaining when threat of force is justified)).[3] In contrast to the defendant in *Gamino*, appellant used deadly force when she shot Linder, and she does not contend that she was entitled to a self-defense instruction under section 9.31. The question before this Court then concerns deadly force and not, as in *Gamino*, whether the defendant's account of what happened supported a reasonable belief that his use of non-deadly force was justified. *See id.* at 512–13.

To support submitting an instruction on the defense of a third person to the jury, appellant was required to present some evidence about the circumstances in the home's living room at the time she shot Linder that would support a rational inference that she had a reasonable belief that Linder was threatening "unlawful deadly force" against Chambers and that her intervention with the use of deadly force against Linder was "immediately necessary to protect" Chambers. *See* Tex. Penal Code § 9.33; *Henley*, 493 S.W.3d at 89–90 (requiring force to be "needed at that moment" in context of defense of third person)*; Morales*, 357 S.W.3d at 8; *Shaw*, 243 S.W.3d at 657–58. Viewing the evidence in the light most favorable to appellant, we conclude that she failed to do so. *See Gamino*, 537 S.W.3d at 510; *Singleton*, 2002 Tex. App. LEXIS 1875, at *14; *see also Pena v. State*, 635 S.W.2d 912, 914 (Tex. App.—Eastland 1982, pet. ref'd) ("Even accepting appellant's

---

[3] Section 9.04 of the Penal Code provides that:

The threat of force is justified when the use of force is justified by this chapter. For purposes of this section, a threat to cause death or serious bodily injury by the production of a weapon or otherwise, as long as the actor's purpose is limited to creating an apprehension that he will use deadly force if necessary, does not constitute the use of deadly force.

Tex. Penal Code § 9.04.

version of the incident, he could not have reasonably believed that it was necessary to stab the decedent five times in order to protect either of the two ladies."). Thus, we conclude that the trial court did not err in denying appellant's requested instruction on the defense of a third person. We overrule appellant's point of error and do not conduct a harm analysis. *See Arteaga*, 521 S.W.3d at 333.

## Conclusion

For these reasons, we affirm the judgment of conviction.

_____

Melissa Goodwin, Justice

Before Chief Justice Rose, Justices Goodwin and Triana

Affirmed

Filed:   January 31, 2018

Do Not Publish