

# NUMBER 13-18-00630-CR

# COURT OF APPEALS

# THIRTEENTH DISTRICT OF TEXAS

# CORPUS CHRISTI - EDINBURG

MICHAEL ALEXANDER MURRAY,                                              Appellant,

v.

THE STATE OF TEXAS,                                              Appellee.

### On appeal from the 36th District Court
### of Aransas County, Texas.

# MEMORANDUM OPINION
### Before Justices Benavides, Hinojosa, and Perkes
### Memorandum Opinion by Justice Benavides

By one issue, appellant Michael Alexander Murray Jr. challenges his conviction for murder, a second-degree felony. *See* TEX. PENAL CODE ANN. § 19.02. Murray argues that the evidence was insufficient to support the jury's rejection of his self-defense argument. We affirm.

# I. BACKGROUND

Murray was indicted for the murder of James Justin Mayes. *See id.* Mikayla Owen, Murray's paramour at the time of the offense, testified that she met Murray and Mayes in June 2017. Owen stated she was a methamphetamine user, used drugs daily with Murray, and he moved in with her shortly after they met. Murray got his methamphetamine from Mayes.

Owen explained that Murray and Mayes were more than "just friends," but not in a relationship. Shortly after Owen met Murray, he confided in her that Mayes had recently "drugged and raped" him and that Murray wanted to "go kill" Mayes. Owen also stated that she knew Murray kept a knife in her bedroom when he stayed with her.

She stated that on the evening of June 20, 2017, they went to Mayes's trailer. Owen said they were going to "rob" Mayes of his drugs, but that Murray also took a knife with him. Murray and Mayes were in the bedroom talking and she went to the car because she "knew what was coming" and "felt uncomfortable." Owen said she heard Mayes yell, looked in the trailer, and saw Murray stab Mayes. She stated that she went inside the trailer as the men were still fighting, yelled at them, and then threw a computer monitor at Mayes, hitting him. At that point, Mayes was able to run out of the trailer and Owen and Murray ran to the car.

As they drove back to Owen's house, Owen then noticed that Murray was bleeding. Owen explained that afterwards, Murray called his mother, told her he "killed him," and Murray's mother called for an ambulance. Owen also testified that she initially lied to the police to protect Murray, but was testifying because she had pleaded guilty to a lesser

2

offense. She also stated that at the time of the offense, she barely knew Murray and they were going to Mayes's trailer to "rob" him of drugs.

Owen resided in a home with John Harmon, her uncle. Harmon testified that Murray had been living there, but he had kicked him out because only family could live at his home. He said Murray had mentioned something to Harmon about killing someone and that he had been assaulted. Harmon loaned Owen and Murray his vehicle that evening. Harmon understood that Murray was going to Mayes's trailer to get his clothes and move out. Harmon and Murray got into an altercation when Owen and Murray returned because Harmon thought Murray had killed his dog, but it was a misunderstanding. Harmon stated that Murray looked "hobbled" and he saw blood on Murray when he returned in the vehicle.

Investigator Armando Chapa of the Aransas County Sheriff's Office, the lead investigator on the case, was first called out to the trailer park, where he encountered a deceased Mayes. Investigator Chapa located a blood trail near the location of Mayes's body and followed it back to Mayes's trailer. He also explained that a knife was found near Mayes's body, outside the neighboring trailer. Investigator Chapa said marijuana and a "crystal substance" were found inside Mayes's trailer and there appeared to have been a struggle inside the trailer. He testified that one knife had been found that evening, and the following day he received a call about another knife that was located in another area of the trailer park that appeared to have blood on it.

Investigator Chapa also responded to the scene where Murray was located. He said Murray had a bad stab wound and had to be life-flighted to a nearby hospital.

3

Investigator Chapa also located two cell phones at Owen's house, which he submitted for analysis, and Facebook messages from Murray to Mayes making plans for that day, as well as a message that stated Murray wanted to "trade" a knife for marijuana.

Lisa Loos, Murray's mother, testified that she had seen Murray earlier in the day and he introduced her to Owen. She said the next time she spoke to him, Owen called her and Murray told her he had been stabbed. Murray also stated, "Mom, I think I killed him," "I am bleeding," and "I think I killed my best friend [Mayes]." Murray told her that Mayes "raped" him on that same day as well.

Two emergency medical providers also testified. Joshua Johnson arrived at the scene where Mayes's body was found and stated that Mayes was already deceased when Johnson arrived. Flight nurse paramedic Christal Tressider responded to the request for a life-flight for Murray. She stated that she was called out because Murray was "pale, sweaty," and he had been bleeding for some time. She observed a wound to the inside of Murray's right knee, but he had not bled through the dressing, which meant the bleeding was controlled by the time Murray was transferred to her.

Aransas County Sheriff Lieutenant Gavin Harrison also responded to both scenes. He testified that Mayes's trailer had lots of blood inside and there appeared to be a struggle. He said Murray's jeans had a stab wound through them on the right leg and he believed that the knife found near Mayes's body was the one used on Murray. Lieutenant Harrison agreed that Murray had a stab wound to his right leg, but saw no other injuries. Lieutenant Harrison explained to the jury that he was trained in knife fighting, and he would have expected Murray to have more injuries if both men had been

4

armed. He agreed on cross-examination that drugs could affect how people react in a knife fight, but they could still be capable of aggression.

Nueces County Medical Examiner Doctor Adel Shaker testified as to Mayes's cause of death. Dr. Shaker stated he found over twenty-five stab wounds on Mayes's body and opined that two stab wounds to the heart caused his death. Dr. Shaker found multiple stabs wounds to the chest area. He also found Mayes's toxicology screen to be positive for methamphetamine and marijuana.

Forensic scientist Dianne Oliver with the Texas Department of Public Safety Crime Lab tested evidence for the presence of blood and DNA. Oliver tested the two knives recovered and both had DNA from Mayes, with an unknown contributor present on one of the knives. According to Oliver, Murray could not be excluded as a contributor but the amount of DNA present was too small to determine who it belonged to. Oliver also tested items of clothing belonging to Owen and Murray's t-shirt recovered that evening. Both items contained DNA matching Mayes.

Murray testified in his own defense. He explained that Mayes was his best friend and he had been living with Mayes since January 2017. Murray said they shared a bed and there was a sexual element to their relationship, but he was not homosexual. He agreed Mayes and he used methamphetamine and marijuana in large quantities together. Murray stated that Mayes wanted a relationship with him, but he would not have intercourse with Mayes. He said one night they took pills together, and when Murray woke up, his butt was hurt and bleeding and he "knew" what happened. Murray also explained that Mayes was jealous of Owen and did not like Murray spending time with

5

her.   After the alleged assault, Murray went to Owen's home and told her, and then later his mother, what had happened.   He wanted to confront Mayes, but asked Owen to go with him to have a witness present.   Murray knew Mayes collected knives and had a large number of knives at the trailer.   Murray carried his own black knife on him too.

Murray stated he told Mayes he was leaving due to what had happened between them.   The conversation escalated and Mayes began yelling and screaming at him, and the men began yelling back and forth.   Owen had gone out to the car during this time. Murray said the men got into a physical altercation in the bedroom and Mayes had pushed him down.   Murray saw Mayes reach for an area where Murray knows Mayes kept his knives and he tried to kick Mayes.   Mayes stabbed Murray in the leg and Owen came into the trailer and threw a computer monitor at Mayes.   Murray stated he was able to get up and grab a decorative knife Mayes had and "freaked out" and stabbed Mayes. Murray explained Mayes came at him, but he grabbed Mayes's hand.   Mayes pushed Murray again, and he fell over items in the trailer.   Murray then said that Mayes took off running out of the trailer.   Murray and Owen left the trailer and returned to her home, where he told Owen to call his mother.   Murray stated that he passed out in the life-flight helicopter.

Murray testified that he does not know what happened to the knife and insisted that he went to Mayes's trailer to get his things and leave.   Murray claimed that he never had any intention of robbing or killing Mayes.   On cross-examination, Murray stated he did not throw the knife in another area of the trailer park and that he attempted suicide because he was very depressed.   Murray explained that he thought he was going to die

6

because Mayes was screaming that he hated him. Murray said he no longer felt safe around Mayes after the assault because Mayes knew there was a "limit" to their relationship. Murray responded on cross-examination that he never mentioned the assault in the Facebook messages to Mayes, but "lots" of people knew about the assault.

At the charge conference, the trial court included an instruction regarding self-defense. *See id.* § 9.31. The jury found Murray guilty of murder. *See id.* § 19.02. During punishment, the jury was given a special instruction regarding sudden passion. *See id.* § 19.02(d). The jury found that Murray was acting under sudden passion when he committed the murder[1] and sentenced Murray to twenty years' imprisonment in the Texas Department of Criminal Justice–Institutional Division and a $10,000 fine. *See id.* This appeal followed.

## II. SELF-DEFENSE EVIDENCE

By his sole issue, Murray argues the evidence is insufficient to support the jury's rejection of his affirmative defense of self-defense.

### A. Standard of Review

Affirmative defenses may be evaluated for legal and factual sufficiency, even though factual sufficiency in criminal cases was abolished in *Brooks v. State*, 323 S.W.3d 893 (Tex. Crim. App. 2010). *Butcher v. State*, 454 S.W.3d 13, 20 (Tex. Crim. App. 2015). When reviewing a jury's rejection of an affirmative defense, we apply both a legal and factual sufficiency standard. *Matlock v. State*, 392 S.W.3d 662, 667 (Tex. Crim. App.

---

[1] At punishment, a "defendant may raise the issue as to whether he caused the death under the immediate influence of sudden passion arising from an adequate cause. If the defendant proves the issue in the affirmative by a preponderance of the evidence, the offense is a felony of the second degree." TEX. PENAL CODE. ANN. § 19.02(d).

2013). We use "traditional Texas civil burdens of proof and standards of review in the context of affirmative defenses where the rejection of an affirmative defense is established by a 'preponderance of the evidence.'" *Id*.

In determining the legal sufficiency of the evidence to support an adverse finding on an affirmative defense, we look to:

> When an appellant asserts that there is no evidence to support an adverse finding on which she had the burden of proof, we construe the issue as an assertion that the contrary was established as a matter of law. We first search the record for evidence favorable to the findings, disregarding all contrary evidence *unless a reasonable factfinder could not*. If we find no evidence supporting the finding, we then determine whether the contrary was established as a matter of law.

*Id*. (quoting *One Ford Mustang VIN 1FAFP40471F207859 v. State*, 231 S.W.3d 445, 449 (Tex. App.—Waco 2007, no pet)). In reviewing the legal sufficiency of the evidence to support an adverse finding on the affirmative defense of self-defense, we first look for evidence ("more than a mere scintilla") that supports the jury's implied finding that Murray did not act in self-defense, and we disregard all evidence of Murray's argument that he acted in self-defense unless a reasonable factfinder could not disregard that evidence. *Id*. If no evidence supports the jury's finding that Murray did not act in self-defense, then we search the record to see if Murray had established, as a matter of law, that he did act in self-defense. *Id*. If the record reveals evidence supporting Murray's position that he did act in self-defense, but the evidence was subject to a credibility assessment and was evidence that a reasonable jury was entitled to disbelieve, we will not consider that evidence in our matter-of-law assessment. *Id*. at 670. Only if the appealing party establishes that the evidence conclusively proves his affirmative defense and "that no

8

reasonable jury was free to think otherwise," may the reviewing court conclude that the evidence is legally insufficient to support the jury's rejection of the defendant's affirmative defense. *Id.* (quoting *Tanner v. Nationwide Mut. Fire Ins. Co.*, 289 S.W.3d 828, 830 (Tex. 2009)). Applying that standard to criminal cases, the defendant is entitled to an acquittal on appeal despite the jury's adverse finding on his affirmative defense "only if the evidence conclusively establishes his affirmative defense under the modified two-step *Sterner* test." *Id.* (citing *Sterner v. Marathon Oil Co.*, 767 S.W.2d 686, 690 (Tex. 1989)) (standard of review that applies when claim of legally sufficient evidence to support adverse finding).

A defendant may also raise a factual-sufficiency challenge to the jury's adverse finding on his affirmative defense. *Id.* To determine factual sufficiency, we adopt the civil standard of factual-sufficiency review because the burden of proof is that of "preponderance of the evidence," the same burden as in civil proceedings. *Id.* (citing *Meraz v. State*, 785 S.W.2d 146, 147 (Tex. Crim. App. 1990) (en banc)). In making a factual-sufficiency claim, the defendant is asserting that, considering the entire body of evidence, the jury's adverse finding on his affirmative defense was so "against the great weight and preponderance" of that evidence to be manifestly unjust. *Id.* (citing *Meraz*, 785 S.W.2d at 154–55). In the factual-sufficiency review of a rejected affirmative defense, an appellate court views the entirety of the evidence in a neutral light, but it may not usurp the function of the jury by substituting its judgment in place of the jury's assessment of the weight and credibility of the witnesses' testimony. *Id.* Therefore, an appellate court may sustain a defendant's factual-sufficiency claim only if, after setting

9

out the relevant evidence and explaining precisely how the contrary evidence greatly outweighs the evidence supporting the verdict, the court clearly states why the verdict is so much against the great weight of the evidence as to be manifestly unjust, conscience-shocking, or clearly biased. *Id.* If an appellate court conducting a factual-sufficiency review finds that the evidence supporting the affirmative defense so greatly outweighs the State's contrary evidence that the verdict is manifestly unjust, then the appellate court may reverse the trial court's judgment and remand the case for a new trial. *Id.* at 672. The remedy in both civil and criminal cases for an appellate reversal based upon a factual-sufficiency claim that the jury's verdict is against the great weight of the evidence is a new trial, not an acquittal. *Id.*

**B. Applicable Law and Discussion**

Murray does not challenge the sufficiency of the evidence to support the jury's finding of the essential elements of murder, but instead challenges the sufficiency of the evidence to support the jury's rejection of his self-defense claim.

To prevail on a claim of self-defense with the use of deadly force, a defendant must prove he was justified in using deadly force. *See* TEX. PENAL CODE ANN. § 9.32(a). Once a defendant has produced some evidence raising the issue of self-defense, the State bears the burden of persuasion to show beyond a reasonable doubt that the defendant's actions were not justified. *Valverde v. State*, 490 S.W.3d 526, 527 (Tex. App.—San Antonio 2016, pet. ref'd). To meet this burden of persuasion, the State is not required to produce additional evidence. *Id.* at 528. When a jury finds the defendant guilty, there is an implicit finding against the defensive theory. *Id.*; *see Zuliani v. State*,

10

97 S.W.3d 589, 594 (Tex. Crim. App. 2003). In conducting a legal sufficiency review, we defer to the jury's assessment of the credibility of the witnesses and the weight to be given to their testimony. *Valverde*, 490 S.W.3d at 528. In a factual sufficiency review, we view the evidence in a neutral light, and cannot overrule the jury's finding unless the verdict is unjust. *See Butcher*, 454 S.W.3d at 20.

This is consistent with Murray requesting a self-defense instruction at trial since "a defensive instruction is only appropriate when the defendant's defensive evidence essentially admits to every element of the offense *including* the culpable mental state, but interposes [a] justification to excuse the otherwise criminal conduct." *Shaw v. State*, 243 S.W.3d 647, 659 (Tex. Crim. App. 2007) (emphasis in original). With regard to the essential elements of the offense, the jury was charged as follows: Murray committed the offense of murder if, with the intent to cause serious bodily injury to Mayes, he committed an act clearly dangerous to human life that caused Mayes's death. In this case, the evidence showed that Murray stabbed Mayes over twenty-five times, which was an act clearly dangerous to human life. Accordingly, consistent with Murray's request for the self-defense instruction, the evidence establishes every essential element of the offense of murder beyond a reasonable doubt. *See Saxton*, 804 S.W.2d at 914. We next examine whether the jury "also would have found against [Murray] on the self-defense issue beyond a reasonable doubt." *Id.*

Although Murray attempted to show a need for self-defense through his testimony, Owen stated that Murray told her he wanted to kill Mayes because of the alleged assault and went to Mayes's trailer with a knife. Harmon testified that Murray said something

11

about killing someone before the incident. Dr. Shaker testified that Mayes had over twenty-five stab wounds. Lieutenant Harrison also stated that Murray sustained only one stab wound, and based on his training, he would have expected to see additional injuries when knives were involved.

In our review, we defer to the jury's assessment of the credibility of the witnesses, and the jury in this case could have disbelieved Murray's argument for self-defense. *See id.* at 529; *see also Brooks*, 323 S.W.3d at 899; *Smith v. State*, 355 S.W.3d 138, 146 (Tex. App.—Houston [1st Dist.] 2011, pet. ref'd) (noting defendant's testimony does not conclusively prove a claim of self-defense because jury could reject the testimony). Although Murray argued that he was justified in acting in self-defense, the jury was free to draw its own conclusion based on the testimony presented. *See Hooper v. State*, 214 S.W.3d 9, 15–16 (Tex. Crim. App. 2007) (noting juries are permitted to draw multiple reasonable inferences from the evidence (direct or circumstantial) as long as each inference is supported by the evidence presented at trial).

Additionally, reviewing the evidence in a neutral light, the jury's verdict was not against the "great weight of the evidence" or manifestly unjust. *Butcher*, 434 S.W.3d at 20 (quoting *Matlock*, 392 S.W.3d at 671). Evidence of Murray's statements and the difference between the injuries alone could support the jury's verdict.

Having reviewed all of the evidence in the light most favorable to the prosecution, we conclude the jury rationally could have found each element of the offense was proven beyond a reasonable doubt, and rationally could have rejected Murray's self-defense claim. We overrule Murray's sole issue.

12

## III.    CONCLUSION

We affirm the trial court's judgment.

GINA M. BENAVIDES,
Justice

Do not publish.
TEX. R. APP. P. 47.2 (b).

Delivered and filed the
10th day of October, 2019.

13